Jennifer CHAPMAN, By and Through her guardian Teresa CHAPMAN, Robert Chapman and Teresa Chapman, individually, Plaintiffs and Appellants,

v.

PRIMARY CHILDREN'S HOSPITAL, a hospital organized to do business in the state of Utah; Primary Children's Medical Center, a hospital organized to do business in the state of Utah; Intermountain Health Care, a Utah corporation, dba Primary Children's Hospital; IHC Hospitals, Inc., a Utah corporation dba Primary Children's Hospital; The Health Services Corporation of the Church of Jesus Christ of Latter-day Saints, a former or present Utah corporation dba Primary Children's Hospital; Garth Myer, M.D.; L. George Veasy, M.D.; Karen Bowman, R.N.; Scott Wetzel Company, a Utah corporation; The Home Group, Inc., a foreign corporation; John Does I–X; and Black Corpo-

ration I–V (Resignated I.H.C., Hospitals, Inc., et al.), Defendants and Appellees.

Jennifer CHAPMAN, By and Through her guardian Teresa CHAPMAN, Robert Chapman and Teresa Chapman, individually, Plaintiffs and Appellants,

v.

SCOTT WETZEL COMPANY, a Utah corporation; The Home Group, Inc., a foreign corporation; Primary Children's Hospital, a hospital organized to do business in the state of Utah, et al., Defendants and Appellees.

Nos. 860230, 860392.

Supreme Court of Utah.

Dec. 27, 1989.

Kathryn Collard, Salt Lake City, P. Richard Meyer, Robert N. Williams, Jackson, Wyo., for appellants.

Gary B. Ferguson, Gary D. Stott, Michael L. Schwab, Salt Lake City, for Garth Myer.

B. Lloyd Poelman, David B. Erickson, Salt Lake City, for Veasy, Bowman, and hosp. entities.

Stephen B. Nebeker, Anthony B. Quinn, Paul D. Newman, Thomas A. Quinn, Salt Lake City, for Scott Wetzel Co. and The Home Group, Inc.

DURHAM, Justice:

This appeal challenges three separate summary judgments granted to defendants in the trial court.[1] Our review is restricted to the question of whether summary judgment was properly granted; we do not address plaintiffs' underlying negligence claims.

Rule 56(c) of the Utah Rules of Civil Procedure provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Our cases make clear that "in reviewing a summary judgment, this Court will view the facts in a light most favorable to the party opposing the motion

---

1. The trial court granted defendants' alternative motions for dismissal and summary judgment. However, since the court considered matters outside the pleadings in connection with each motion, the court's action is properly viewed as a summary judgment. *See Lind v. Lynch,* 665 P.2d 1276 (Utah 1983).

and will allow the summary judgment to stand only if the movant is entitled to summary judgment as a matter of law on the undisputed facts." *Brower v. Brown*, 744 P.2d 1337, 1338 (Utah 1987) (quoting *Barlow Society v. Commercial Security Bank*, 723 P.2d 398, 399 (Utah 1986) (citations omitted)).

Plaintiff Jennifer Chapman was born on August 10, 1972. During the first five months of her life, she experienced cardiac and respiratory difficulties for which she was treated in an Ogden hospital. In early 1973, her Ogden physicians referred her to the care of defendant Dr. L. George Veasy at Primary Children's Hospital in Salt Lake City. Dr. Veasy determined that Jennifer was suffering from a heart problem. Another physician performed surgery on Jennifer to install a "Waterston shunt," a device used for the purpose of increasing blood flow between the heart and lungs. That device did not function as expected, and on February 28, 1973, a second operation was performed to correct the shunt. Several hours after the second surgery, Jennifer experienced convulsions, followed shortly by cardiac arrest. The episode left Jennifer tragically impaired, with permanent, incapacitating mental and physical disabilities.

There is no dispute between the parties as to the preceding facts. However, Jennifer's parents (also plaintiffs in this action) filed affidavits in which they additionally alleged irregularities in Jennifer's post-operative care. The Chapmans stated that they visited Jennifer as soon as she recovered from the anesthesia administered for the second operation. A few minutes after this visit, Mrs. Chapman returned to the child's room, where she found one of the nurses busy with the heart monitor attached to Jennifer's chest. The nurse told Mrs. Chapman that the monitor had sounded its alarm and that she could not get the machine properly set. Mrs. Chapman's affidavit states that the nurse was preparing to leave the room to find someone to help her adjust the heart monitor when Mrs. Chapman asked her whether the anesthetic was making Jennifer look peculiar. The nurse examined Jennifer, determined that she was in cardiac arrest, and summoned help. Jennifer survived the incident, but was left with severe brain damage.

The Chapmans maintain that some time later they consulted Dr. Veasy to determine whether he believed Jennifer's Ogden physicians had been negligent in failing to refer Jennifer to Dr. Veasy's care more promptly so that her condition might not have deteriorated so seriously. They allege that Dr. Veasy told them that tests had been performed which showed that Jennifer's injuries had resulted from a blood clot or blood clots flooding her brain and that the incident was unrelated to anyone's negligence and could not have been avoided. The record reveals that despite Dr. Veasy's alleged attempts to discourage them, the Chapmans nevertheless filed suit against the Ogden physicians in October 1975. That suit was later dismissed without prejudice on motion of the Chapmans' attorney.

The Chapmans allege that because of Dr. Veasy's representations that Jennifer's injuries could not have been avoided, they were prevented from discovering that the true cause of her injuries had not been determined or even adequately investigated. They claim that because of their trust and confidence in Dr. Veasy, they had no reason to suspect that his statements to them were unsupported until they received Jennifer's medical records in July 1984. The records did not show that any tests had been performed. The Chapmans stated that when they confronted Dr. Veasy with the hospital records, he admitted that tests had never been conducted and that his previous statements reflected only his assumptions about the cause of Jennifer's injuries. According to Mr. Chapman's affidavit, a second medical opinion obtained in January 1985 revealed for the first time that Jennifer's injuries were most likely caused by oxygen deprivation resulting from delay in treating Jennifer's cardiac arrest.

The Chapmans' suit, filed in October 1985, named nine individual and corporate defendants who may be divided into three groups, based on the allegations against

them. The first group of defendants (hereinafter "the hospital defendants") includes Dr. Veasy, Primary Children's Hospital and its parent corporations, and the nurse the Chapmans claim was originally negligent. The second group consists of the Scott Wetzel Company, which was hired to investigate accident claims against the hospital, and its parent corporation, The Home Group, an insurance company. The Chapmans base their charges against these defendants on statements allegedly made by a Scott Wetzel representative which the Chapmans claim amounted to fraudulent concealment of medical malpractice. Finally, the Chapmans sued Dr. Myer, another hospital physician who became involved in Jennifer's treatment shortly after her cardiac arrest. The Chapmans allege that Dr. Myer was negligent in failing to provide adequate care. We will address separately the summary judgments granted to defendants.

■ We treat first the question of whether the Chapmans' lawsuit was filed in a timely manner under the statute of limitations in Utah's Health Care Malpractice Act. Under that statute, if plaintiffs were simply alleging that misconduct on the part of health care practitioners produced Jennifer's injuries, their suit would appear to be barred. The statute provides:

No malpractice action against a health care provider may be brought unless it is commenced within two years after the plaintiff or patient discovers, or through the use of reasonable diligence should have discovered[,] the injury, whichever first occurs, but *not to exceed four years after the date of the alleged act, omission, neglect or occurrence....*

Utah Code Ann. § 78–14–4(1) (1987) (emphasis added). However, plaintiffs' allegations of fraudulent concealment bring their causes of action under section 78–14–4(1)(b), which establishes the statutory bar at one year after "the plaintiff or patient discovers, or through the use of reasonable diligence, should have discovered[,] the fraudulent concealment, whichever first occurs." With respect to the hospital defendants, we find that the Chapmans' asser-

tions, taken as a whole, give rise to genuine questions of material fact regarding the existence of fraudulent concealment.

■ In reaching this conclusion, we interpret the "discovery of fraudulent concealment" provision of the statute as incorporating discovery of legal injury as well as discovery of fraudulent concealment. This Court defined "legal injury" in *Foil v. Ballinger,* 601 P.2d 144 (Utah 1979), where we considered the requirement under the Health Care Malpractice Act that a suit for medical malpractice must be commenced within two years after discovery of a patient's injury. The plaintiff in that case filed suit four years after her doctor negligently administered anesthesia. She did not dispute that she had suffered physical disabilities for more than two years before she filed suit, but claimed that she had not discovered evidence that her doctor's negligence had caused her injuries until three years after she had left his care. We held that, for purposes of that statute, "the two-year provision does not commence to run until the injured person knew or should have known that he had sustained an injury *and* that the injury was caused by negligent action." *Id.* at 148 (emphasis added). Discovery of legal injury, therefore, encompasses both awareness of physical injury and knowledge that the injury is or may be attributable to negligence.

According to the Chapmans' version of the facts, while they knew of Jennifer's disabilities in 1973, they were not put on notice that legal injury or fraudulent concealment had occurred until July 1984, when they learned from Jennifer's hospital records that no tests had been performed to discover the cause of her injuries. This piece of information was sufficient to start the running of the statute, since it alerted them to the possibility that Jennifer's injuries might be attributable to something other than an accident or unavoidable event. They claim that they confronted Dr. Veasy in July 1984 regarding the discrepancy between what he had told them and what the hospital's records revealed and that when he admitted that no tests had been performed, they sought and received another medical opinion in January

1985. Inasmuch as we are reviewing a summary judgment granted to defendants, we must accept the Chapmans' account of the facts. *Id.* at 147. Their lawsuit, filed in October 1985, was therefore timely.[2]

The hospital defendants argue that the Chapmans' claim is governed by Utah Code Ann. § 78–14–4, which deals with ordinary medical malpractice. They contend that the Chapmans have suspected misconduct on the part of Primary Children's Hospital staff since the date on which Jennifer's injuries occurred. Dr. Veasy, in an affidavit, maintained that since February 1973, he had had numerous discussions and some correspondence with the Chapmans regarding Jennifer's condition and that on several occasions they expressed the belief that her injuries were caused by the hospital's negligence. As evidence of the Chapmans' belief in the hospital's wrongdoing, Dr. Veasy submitted to the trial court as an exhibit a letter written to him by Mr. Chapman sometime before May 1977. The letter refers to a discussion between Mr. Chapman and Dr. Veasy in which Mr. Chapman apparently sought information and assistance from Dr. Veasy concerning a malpractice suit he was considering filing. It is evident from the letter that Dr. Veasy had expressed unwillingness to assist the Chapmans in the lawsuit. The letter also contains an attempt by Mr. Chapman to explain why he felt the suit was justified[3] and a request that Dr. Veasy reconsider his opposition to the lawsuit.[4]

Defendants argue that the inference is inescapable that this letter referred to a proposed malpractice action against Primary Children's Hospital. That construction, however, was controverted by Mr. Chapman in an affidavit stating that the subject of the letter was the malpractice suit against the Ogden physicians who treated Jennifer for the first five months of her life. In our judgment, the letter's language supports the Chapmans' case at least as strongly as it does defendants' and therefore raises an issue of material fact. For one thing, the letter contains the following language: "[Jennifer] was hurt and hurt bad because of wrong decisions made in her early life.... She suffered and felt pain for the first five months of her life only to be turned away by doctors that didn't have time for little girls that could hold their breath." This description fits the causes of action in the Chapmans' 1975 lawsuit against the Ogden doctors, who the Chapmans claimed had been negligent in not referring Jennifer to Dr. Veasy earlier. It would be entirely reasonable for a fact finder to conclude that the malpractice discussed between Mr. Chapman and Dr. Veasy was that of the Ogden physicians and not that of Primary Children's Hospital staff.

■ We also reject defendants' claim that the Chapmans failed to plead fraud with sufficient particularity to withstand a motion for summary judgment. Rule 9(b) of the Utah Rules of Civil Procedure does specify that "[i]n all averments of fraud or

---

**2.** A statutory provision requiring that defendants receive ninety days' notice of plaintiffs' intent to sue may extend the limitation period up to 120 days. Utah Code Ann. § 78–14–8 (1987). The Chapmans claim that their notice of intent and complaint were timely filed under the applicable statutes. Since defendants do not contest that claim, we will assume that plaintiffs' filing of the complaint in October 1985 rather than July 1985 reflects the operation of such an extension.

**3.** According to the letter, "[Jennifer] is entitled to security for as long as she is willing to go on struggling for her life. This case has to be weighed upon its individual merits and not by what it costs for insurance for each bed in a hospital. I reemphasize that I am not seeking to destroy anyone or collect a fortune in blood money.... I can no longer depend on other people to care for my daughter. She is only loved in our home and the financial burden is to [sic] great for me to bare [sic] alone."

**4.** "Now I am well aware that I am not qualified medically or legally to answer all the questions pertaining to a malpractice suite [sic].... The negligence is obvious but to what extent the physical damage can be linked to this negligence only a man of your medical knowledge can know for sure.... Before too long my atorney [sic] will be in contact with you and I ask that you realize that he represents Jennifers [sic] interests and set aside your feeling toward the legal profession. It is imparative [sic] that we have honest factual answers."

mistake, the circumstances constituting fraud or mistake shall be stated with particularity." We have stressed, and continue to hold, that mere conclusory allegations in a pleading, unsupported by a recitation of relevant surrounding facts, are insufficient to preclude dismissal or summary judgment. *See Norton v. Blackham,* 669 P.2d 857, 859 (Utah 1983); *Ellefsen v. Roberts,* 526 P.2d 912, 915 (Utah 1974). In this case, however, the Chapmans' complaint, though drafted in an admittedly "scattershot" fashion, contains the averments that defendants withheld information regarding the cause of Jennifer's injuries and "misinformed [the Chapmans] by, among other things, advising them that the brain damage sustained by Jennifer Chapman was an unavoidable event which was not caused by any misconduct on the part of any of the defendants." This is a sufficiently clear and specific description of the facts underlying the Chapmans' claim of fraudulent concealment to support our conclusion that the requirement of rule 9(b) has been met. *See Peteler v. Robison,* 81 Utah 535, 553, 17 P.2d 244, 250 (1932).

Summary judgment is not appropriate unless the parties' pleadings and affidavits make it clear that no genuine issue remains as to matters of material fact. In this case, the hospital defendants' pleadings and affidavits are directly and adequately controverted by those of plaintiffs. It may be a close call whether, for example, the Chapmans were sufficiently alerted to the possibility of medical malpractice at the time of Jennifer's cardiac arrest to start the statute of limitations running or whether, assuming the Chapmans' allegations are true, they should reasonably have disregarded Dr. Veasy's representations and made an independent inquiry. Such close calls are for juries, not judges, to make. We cannot, while such questions exist, uphold the trial court's determination that defendants were entitled to summary judgment as a matter of law. On the facts they have alleged against the hospital defendants, the Chapmans are entitled to their day in court. *See Brower,* 744 P.2d at 1339.

 We take a different view of the Chapmans' claims against Dr. Myer. In contrast to the fact-specific claims against the hospital defendants, the charges against Dr. Myer are vague and conclusory, telling virtually nothing about what Dr. Myer allegedly did or neglected to do. As we noted in *Ellefsen v. Roberts,* "The sufficiency of plaintiff's pleadings ... must be determined by the facts pleaded rather than the conclusions stated." 526 P.2d at 915; *see also Hall v. Fitzgerald,* 671 P.2d 224, 226–27 (Utah 1983); *Massey v. Utah Power & Light,* 609 P.2d 937, 938 (Utah 1980). The Chapmans filed no supporting affidavits to expand upon their complaint in this regard. Since the Chapmans have raised no genuine issue of fraudulent concealment on Dr. Myer's part, we hold that summary judgment was properly granted as to him.

 In the case of defendants Scott Wetzel Company and The Home Group, we hold that, even if the Chapmans' claims are taken as true, no fiduciary relationship existed between the Chapmans and these defendants sufficient to give rise to a duty of disclosure. The Chapmans allege that they met with a Scott Wetzel representative in 1985 and that in the course of that meeting he made the statement that "Dr. Veasy [was] much too professional to cover anything up." Defendants do not contest the Chapmans' account of this conversation. However, our cases dealing with fraudulent concealment indicate that neither material omissions nor fraudulent affirmative statements are actionable absent a duty to speak the truth. *See Sugarhouse Finance Co. v. Anderson,* 610 P.2d 1369, 1373 (Utah 1980); *Elder v. Clawson,* 14 Utah 2d 379, 382, 384 P.2d 802, 804 (1963). In this case, the Scott Wetzel Company was under an independent contract to Intermountain Health Care—the parent corporation of Primary Children's Hospital—to investigate accident claims involving Intermountain Health Care; it had no responsibility to the Chapmans. The Home Group had no involvement with the parties other than the fact that Scott Wetzel is its wholly owned subsidiary. Finally and in any event, the statement in question could not, as a mat-

ter of law, be construed as fraudulent concealment of negligence by the hospital defendants. The summary judgment granted on behalf of Scott Wetzel and The Home Group is therefore affirmed.

This case is remanded for trial of plaintiffs' claims against the hospital defendants.

We reverse the summary judgment granted to Dr. Veasy and the hospital defendants and affirm the summary judgments granted Dr. Myer, Scott Wetzel Company, and The Home Group.

HALL, C.J., HOWE, Associate C.J., and STEWART, J., concur.

ZIMMERMAN, J., having disqualified himself, does not participate herein.