Timothy **BERENDA, Roger Whitehouse, and Anthony Thomas, individually, and American Technology and Equipment Corporation International, Ltd., aka Amtec International, a California corporation, Plaintiffs and Appellants,**

v.

Gordon B. **LANGFORD, Michael Gilano, Team8 Limited, Inc., Michael A. Gilano, and John Does 3 through 5, Defendants and Appellees.**

No. 940370.

Supreme Court of Utah.

March 25, 1996.

John W. Call, Bruce E. Coke, Salt Lake City, and Curtis C. Nesset, Athens, Georgia, for plaintiffs.

Glen D. Watkins, Bruce Wycoff, Salt Lake City, for defendants.

ZIMMERMAN, Chief Justice:

Timothy Berenda, Roger Whitehouse, Anthony Thomas, and American Technology and Equipment Corporation International, Ltd. ("Amtec"), appeal from a grant of summary judgment in favor of defendants Gordon B. Langford and other named and unnamed parties. Amtec, a California corporation, and Berenda, Whitehouse, and Thomas, as individual shareholders and former officers and directors of Amtec (collectively, the "Amtec plaintiffs"), sued Langford, also a shareholder and former officer and director of Amtec, and others, alleging that Langford breached his fiduciary duty to Amtec by misappropriating corporate assets and that he committed fraud by concealing the breach. Langford moved for summary judgment, contending that two letters written by Berenda evidenced sufficient suspicion of Langford's activities to trigger the running of the statute of limitations contained in section 78–12–27 of the Utah Code, thus barring plaintiffs' claims. The district court agreed and granted summary judgment in favor of Langford. We reverse and remand.

" 'Before we recite the facts, we note that in reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' " *K & T, Inc. v. Koroulis,* 888 P.2d 623, 624 (Utah 1994) (quoting *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993)). Because Langford moved for summary judgment, we state the facts in the light most favorable to the Amtec plaintiffs.

Amtec's business consisted in part of developing and manufacturing dozens of toys and other novelties. At all time periods relevant to this appeal, Berenda, Whitehouse, Thomas, and Langford each owned twenty-five percent of Amtec's stock. Langford, as Amtec's chairman and chief executive officer, was officially responsible for Amtec's research and development, technical, and sales efforts. Langford knew the technical details of each new project intimately, which he discussed with others only briefly at various meetings. Whitehouse was Amtec's presi-

dent, Thomas was Amtec's vice president for operations, and Berenda was also an officer of the company.

In March of 1989, Langford worked with a consultant to Amtec, Michael Gilano, to develop a prototype of a toy dubbed "the Ghostwriter." The Ghostwriter is similar to the more familiar "Etch–A–Sketch," except that the Ghostwriter uses a viscous liquid to hold magnetic particles in suspension. A magnetic pen draws the particles to the surface of the toy to create images, which are then erased when the liquid inside the toy moves. The record suggests that Langford worked on two prototypes of the toy. Amtec showed the first prototype to Abrams Gentile Entertainment, a New York toy company, in March of 1989, but that company did not accept the product. Sometime thereafter, Langford told Whitehouse that he was attempting to arrange a marketing agreement for the Ghostwriter with the Ohio Arts Company. However, in May of 1989, Langford signed a licensing agreement with Ohio Arts under which only he and Gilano were entitled to be paid the royalties from Ohio Arts for the second version of the Ghostwriter. The agreement required Ohio Arts to pursue a patent application, and Langford and Gilano were listed as co-inventors on patent documents filed with the federal government. Langford kept some or all of the information relating to the Ghostwriter in his personal files rather than in corporate files. Neither Whitehouse, Berenda, nor Thomas was aware of the licensing agreement when Langford signed it.

Also during the spring of 1989, Berenda became dissatisfied with Langford's management of Amtec and wanted out of the company. He attempted to get more information about Amtec to establish a price for his shares of stock. However, Langford gave standing orders to all Amtec employees not to provide certain corporate information to Berenda. In July of 1989, Amtec offered to buy Berenda's stock. Berenda accepted the offer and resigned as an officer and employee of Amtec. In the fall of 1989, Amtec held a board of directors' meeting at which Langford requested more compensation for himself but also said that Amtec had insufficient funds to follow through on the purchase of Berenda's stock. Curious about that inconsistency, Thomas asked about the Ghostwriter and, according to Thomas, Langford told him "that it had fizzled and that nothing would come of it."

After Langford reneged on Amtec's offer to purchase Berenda's stock, Berenda wrote a letter dated October 26, 1989, to Langford, Whitehouse, and Thomas. The letter initially refers to a "ridiculous" and "offensive" offer, presumably a renewed offer to purchase Berenda's stock, and then continues:

Considering our conversation about your personal interest, I am beginning to wonder if I have been told about all of the activities that you personally or Amtec may be involved in and why, if I was not told, then how were you able to get projects outside of the purview of Amtec operations without approval of the Board of Directors, of which I am a member. After talking to you, I now believe that there are many profitable activities and projects that have been transferred from Amtec to you personally, WHY?

As I have said to you before, it's really none of my business in the event that your "private or personal dealings" were done outside Amtec without usage of company time, money, clients, or personnel; or in the event a buy out occurs. But in the event it does not occur and I uncover through an investigation, questionable acts by the Chairman of the Board and CEO of Amtec, it certainly becomes some of my business, and I will get to the bottom of it!

I am making one last attempt to finish the negotiations at hand before I take other actions to protect my share of the stocks. Please find enclosed my final offers. I wish for you to review the enclosed with more intensity than you have given so far. Please consider and weigh all the facts that are involved in this crucial situation now.

In a brief discussion of Berenda's letter, Langford indicated to Whitehouse that Berenda was a "pain in the neck" and that they should buy out Berenda as cheaply as possible, giving him as little information as they could.

Also in the late fall of 1989, Langford began to pursue a merger opportunity with Vintage Capital Corporation ("Vintage") that would allow Amtec to go public, expand, and buy out some of its stockholders. Langford negotiated the merger without consulting the other members of Amtec's board. During this time, Langford discussed the Ghostwriter project with Whitehouse and indicated that if Berenda's stock were purchased and Thomas' interest were either purchased or bought out in the proposed merger, the benefits of the Ghostwriter project would then accrue to Langford and Whitehouse as the remaining shareholders of Amtec.

As Thomas and Berenda began receiving documents regarding the merger, they noticed corporate names and agreements between those corporations and Amtec that they had not heard of before. As a result, Berenda wrote a second letter, cosigned by Thomas and dated February 27, 1990, to Langford and Whitehouse, which substantially reiterated the complaints mentioned in Berenda's earlier letter, but this time in reference to the proposed merger with Vintage. Berenda stated in a subsequent affidavit that his intent in sending the second letter was to obtain information about an apparent effort to transfer Amtec's assets to Vintage and to give Langford an unjustifiably greater ownership interest in Vintage. Similarly, Thomas stated that the letter reflected his unease, after reviewing the merger documents, that Langford was doing a number of things without informing the other Amtec directors. After receiving the letter, Langford told Berenda to stop asking questions and causing problems or the merger would fail and the Amtec shareholders would get nothing. Langford again directed Whitehouse not to provide any information to Berenda or Thomas without Langford's personal approval.

In early 1990, Berenda was asked to resign as an Amtec director to facilitate the merger, which he did. Langford and Whitehouse signed the Amtec–Vintage merger documents in March of 1990. Whitehouse was then replaced as president and was subsequently fired from Amtec. As of late 1990, neither Berenda, Thomas, nor Whitehouse

had received any money as a result of the merger. In early 1991, Berenda learned that the merger had failed and that the Securities and Exchange Commission had levied civil sanctions against the brokers involved because the merger prospectus included false information. In April of 1991, while investigating the failed merger, Berenda learned that the Ohio Arts Company had begun manufacturing the Ghostwriter and that Langford was receiving the royalties for the toy. Berenda then told Thomas and Whitehouse about the Ghostwriter. Meanwhile, in February of 1991, the state of California suspended Amtec's corporate authority for failure to file an annual report, and it did so again in July of 1991 for Amtec's failure to pay taxes.

The Amtec plaintiffs filed the instant suit against Langford and the other named and unnamed defendants on March 22, 1993. The complaint, as subsequently amended, alleged that Langford breached his fiduciary duty of loyalty by (i) misappropriating a corporate opportunity when he patented the Ghostwriter in concert with other named and unnamed defendants; (ii) misappropriating royalties for the Ghostwriter; (iii) negotiating other royalty agreements under which he received royalties belonging to Amtec; (iv) engaging in outside employment with Amtec competitors; (v) charging personal expenses to Amtec; (vi) appropriating Amtec funds for his personal use; (vii) failing to provide an accounting; and (viii) failing to pay corporate taxes and notices which resulted in Amtec's suspension and dissolution.

The complaint alleged that Langford had fraudulently concealed his breaches by (i) instructing others not to discuss certain corporate activities with Berenda, Thomas, or Whitehouse; (ii) attempting to force Berenda out as an officer and a stockholder to prevent Berenda from discovering Langford's activities; (iii) intentionally misrepresenting Amtec's value; (iv) arranging the failed merger; (v) failing to disclose his employment with Amtec's competitors; and (vi) failing to disclose an advance payment from Ohio Arts for anticipated Ghostwriter royalties. The complaint also alleged that Langford's activities resulted in defendants' unjust enrichment

and prayed for an accounting, imposition of a constructive trust, and punitive damages.

Langford counterclaimed for unjust enrichment, alleging that he had expended funds, loaned Amtec technology and product samples developed by him outside of his employment with Amtec, and paid creditors on behalf of Amtec without receiving reimbursement from Amtec.

Langford then moved for summary judgment, contending that the Amtec plaintiffs' suit was time-barred by the three-year statute of limitations contained in section 78–12–27 of the Utah Code. Langford asserted that Berenda's letters demonstrated "actual notice" of the facts on which the claims against Langford were based. The district court agreed and granted Langford summary judgment because Berenda had written the letters more than three years before filing the instant complaint. In particular, the court concluded as a matter of law that the two letters "reflect, in tone and content, clear suspicions of wrongdoing [which] gave rise to a legal duty to make further inquiry.... Suspicion, which plaintiffs acknowledge, and inquiry constitute sufficient 'knowledge' to commence the running of the statute of limitations ..., because the means of knowledge is equivalent to knowledge."

The Amtec plaintiffs then moved to amend the judgment on the ground that Langford's fraudulent concealment of their cause of action tolled the statute of limitations. After a hearing on the motion, the trial court entered additional findings of fact and conclusions of law, holding that plaintiffs could not invoke the tolling provisions of the fraudulent concealment version of Utah's discovery rule. The court reasoned that because the statute of limitations began to run in October of 1989, their suit had to be filed by October of 1992. Because Berenda, Thomas, and Whitehouse discovered Langford's misappropriation of the Ghostwriter in April of 1991, they could have filed suit before October of 1992. Therefore, because they did not file suit until March of 1993, the court ruled that the discovery rule "ha[d] no application" and that their suit was time-barred.

The Amtec plaintiffs appeal the trial court's ruling, contending that the court misinterpreted and incorrectly applied the statute of limitations found in section 78–12–27 of the Utah Code, ignored uncontroverted evidence of Langford's fraudulent concealment, and incorrectly ruled that there were no issues of material fact precluding summary judgment.

▮ We first state the applicable standard of review. Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Higgins,* 855 P.2d at 235. "Because entitlement to summary judgment is a question of law, we accord no deference to the trial court's resolution of the legal issues presented." *K & T, Inc.,* 888 P.2d at 627 (citing *Higgins,* 855 P.2d at 235; *Ferree v. State,* 784 P.2d 149, 151 (Utah 1989)). " 'We determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact.' " *Id.* (quoting *Ferree,* 784 P.2d at 151).

The primary issue in this case is when the statute of limitations began to run on the Amtec plaintiffs' claims. They contend that the statute did not begin to run until Berenda actually discovered Langford's misappropriation in April of 1991. Langford contends, and the trial court agreed, that the statute began to run when the Amtec plaintiffs suspected they might have a potential claim and that such suspicion was indisputably manifested in Berenda's first letter of October of 1989. We disagree with both parties' contentions. We first examine the application of the discovery rule when a plaintiff alleges and makes out a prima facie case that a defendant has taken affirmative steps to conceal the plaintiff's cause of action. We then apply that rule to the instant case and conclude that disputed issues of material fact exist so as to preclude summary judgment.

▮ Generally, a cause of action accrues "upon the happening of the last event necessary to complete the cause of action." *Myers v. McDonald,* 635 P.2d 84, 86 (Utah 1981). However, in certain instances, the discovery rule "may operate to toll the period of limita-

tions 'until the discovery of facts forming the basis for the cause of action.' " *Walker Drug Co. v. La Sal Oil Co.*, 902 P.2d 1229, 1231 (Utah 1995) (quoting *Myers*, 635 P.2d at 86). The discovery rule applies when mandated by statute, when a defendant has concealed a plaintiff's cause of action, or when exceptional circumstances exist. *Id.* Under the discovery rule, " 'the limitations period does not begin to run until the discovery of facts forming the basis for the cause of action.' " *O'Neal v. Division of Family Servs.*, 821 P.2d 1139, 1143 (Utah 1991) (quoting *Myers*, 635 P.2d at 86).

Langford moved for summary judgment on the basis of the statute of limitations found in section 78–12–27 of the Utah Code. That section provides:

> Actions against directors or stockholders of a corporation to recover a penalty or forfeiture imposed, or to enforce a liability created, by law must be brought within three years after the discovery, by the aggrieved party, of the facts upon which the penalty or forfeiture attached, or the liability accrued. . . .

Utah Code Ann. § 78–12–27.[1] By its express terms, the statute mandates that we apply the discovery rule. In addition, the Amtec plaintiffs presented a prima facie case that Langford fraudulently concealed their cause of action. It is the application of the discovery rule in the context of a defendant's fraudulent concealment that is at issue in the instant case. Specifically, we must address the legal standard for determining when a plaintiff discovers the facts constituting the plaintiff's cause of action in such situations.

As noted, Langford takes the position that Berenda's letter of October 1989 demonstrates Berenda's "discovery" of Langford's misappropriation. Langford relies on two recent opinions in which we held that "[a]ll that is required [to trigger the statute of limitations] is . . . sufficient information to apprise [the plaintiffs of the underlying cause of action] so as to put them on notice to make further inquiry if they harbor doubts or questions" about the defendant's actions. *United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 889 (Utah 1993); *see also Baldwin v. Burton*, 850 P.2d 1188, 1196 (Utah 1993) ("[T]he three-year statute of limitations for fraud 'begins to run from the time the person entitled to the property knows, or by reasonable diligence and inquiry should know, the relevant facts' of the fraud." (quoting *Auerbach v. Samuels*, 10 Utah 2d 152, 349 P.2d 1112, 1116 (1960))).

However, under our case law the rule is otherwise when a plaintiff alleges that a defendant took affirmative steps to conceal the plaintiff's cause of action, as is the case here. In such a situation, the plaintiff can avoid the full operation of the discovery rule by making a prima facie showing of fraudulent concealment and then demonstrating that given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier. *See Warren v. Provo City Corp.*, 838 P.2d 1125, 1130 (Utah 1992) (balancing reasonableness of plaintiff's diligence in discovering claim against defendant's acts of concealment);[2] *Chapman v. Primary Children's Hosp.*, 784 P.2d 1181, 1186 (Utah 1989) (same); *Vincent v. Salt Lake County*, 583

---

1. The Amtec plaintiffs note that this section may not apply to their claims because Langford has not caused a penalty or forfeiture to be imposed on the corporation, nor are they seeking to enforce a liability created by law. Even if we were to agree with the Amtec plaintiffs, we refuse to address this issue because they have raised it for the first time on appeal. "As a general rule, we will review issues raised for the first time on appeal only if exceptional circumstances or 'plain error' exists." *Salt Lake City v. Ohms*, 881 P.2d 844, 847 (Utah 1994). On appeal, the Amtec plaintiffs do not contend that exceptional circumstances or plain error exists but, rather, that their action "survives the *correct* application of § 78–12–27," even if other limitations statutes would have been more appropriate.

2. We acknowledge that in *Warren v. Provo City Corp.*, 838 P.2d 1125, 1129–30 (Utah 1992), we examined *whether* to apply the judicially created fraudulent concealment version of the discovery rule to toll an otherwise fixed statute of limitations that contained no internal discovery rule, while our present inquiry focuses on *how* to apply that rule given the express discovery provision in Utah Code Ann. § 78–12–27. However, because each inquiry requires balancing the reasonableness of the plaintiff in pursuing its claim against the defendant's affirmative actions to conceal the plaintiff's cause of action, we take guidance from the standard set forth in *Warren*.

P.2d 105, 107 (Utah 1978) (finding that reasonable reliance on defendant's misrepresentations tolled statute of limitations until discovery of cause of damage); *see also* Richard L. Marcus, *Fraudulent Concealment in Federal Court: Toward a More Disparate Standard?*, 71 Geo.L.J. 829, 855 (1983) ("[T]he plaintiff must prove that the defendant concealed the wrong and that as a result the plaintiff could not, with due diligence, have discovered his claim sooner."). Thus, the fraudulent concealment version of the discovery rule aims to navigate a balance between two competing policies: (i) that which underlies all statutes of limitations, namely, " 'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared,' " *Myers*, 635 P.2d at 86 (quoting *Order of R.R. Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 88 L.Ed. 788 (1944)); and (ii) that of not allowing a defendant who has concealed his wrongdoing to profit from his concealment. *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874); *see also* Marcus, *supra*, at 872 (discussing *Bailey v. Glover*). To the extent that the rule requires an examination of the reasonableness of a plaintiff's conduct in light of the defendant's actions, *see Warren*, 838 P.2d at 1130, it differs from the rule as applied when no fraudulent concealment is alleged.

In light of the foregoing, we find Langford's reliance on *United Park City Mines* and *Baldwin* unhelpful because those cases did not involve a defendant's affirmative fraudulent concealment of the plaintiff's cause of action. In *United Park City Mines*, we refused to toll the statute of limitations for shareholders who claimed that an earlier restructuring agreement was unfair to them. We held that a proxy statement describing the restructuring agreement provided sufficient information to put the shareholders on notice of the need to inquire further about the agreement, because the proxy statement disclosed the very facts upon which the shareholders' allegations of unfairness arose. *United Park City Mines*, 870 P.2d at 889. We specifically noted that the case raised no

suggestion of fraud or secret profiting by the defendants. *Id.* at 890.

Likewise, in *Baldwin*, we refused to toll the statute of limitations for judgment creditors seeking to set aside a fraudulent conveyance. The creditors claimed that the statute did not begin to run until they had actual notice of the facts constituting the fraud. *Baldwin*, 850 P.2d at 1197. We held that the creditors would have discovered the conveyance had they conducted a normal search of property upon which to levy when they received their judgment against the debtor. *Id.* Lacking allegations that the debtor had concealed the deed effecting the fraudulent conveyance, we held that the creditors were on constructive notice of the conveyance, and therefore its fraudulent nature, because "[t]he means of knowledge were available" to the creditors. *Id.*

In both cases, then, the equitable maxim that "the means of knowledge is equivalent to knowledge" applied to trigger the running of the statute of limitations. *See id.* at 1196. Simply put, neither case required us to judge the reasonableness of the plaintiff's conduct in light of the defendant's acts of concealment.

■ At its most basic level, the fraudulent concealment version of the discovery rule requires a determination of (i) when a plaintiff would reasonably be on notice to inquire into a defendant's wrongdoing despite the defendant's efforts to conceal it; and (ii) whether a plaintiff, once on notice, would reasonably have, with due diligence, discovered the facts forming the basis of the cause of action despite the defendant's efforts to conceal those facts. Although deceptively simple in theory, the rule has led to disarray as courts have attempted to articulate and apply hard and fixed subrules to determine whether a statute of limitations should be tolled as a matter of law on the particular facts of specific cases. *See* Marcus, *supra*, at 855; *cf. State v. Pena*, 869 P.2d 932, 938 (Utah 1994) (discussing pitfalls of such fixed subrules in connection with Utah waiver law).

■ For instance, some courts have relaxed the inquiry prong of the rule. These courts place the burden on the defendant to

"show something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment." *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1491 (D.C.Cir.1989). This subrule is based on the premise that fraudulent concealment "by its nature makes discovery of the true facts more difficult, in part because it obscures the significance of such information as comes to plaintiff's attention." *Id.; see also Anderson v. Anderson, Kaufman, Ringert & Clark, Chartered,* 116 Idaho 359, 775 P.2d 1201, 1204–06 (1989) (requiring actual or constructive knowledge of breach of fiduciary duty before duty arises to investigate further). To the same end, other courts distinguish a plaintiff's awareness of wrongdoing that is unrelated to the cause of action at issue from the plaintiff's awareness of the underlying cause of action and have required some factual nexus between the two to find that a reasonable plaintiff should have discovered the underlying cause of action. *See, e.g., King & King Enters. v. Champlin Petroleum Co.,* 657 F.2d 1147, 1155–56 (10th Cir.1981) (holding that knowledge that competitor was raising and lowering prices did not constitute knowledge of price-fixing conspiracy), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).

Other courts have taken a different route, relaxing the due diligence prong of the discovery rule instead. For instance, even if the plaintiff is on inquiry notice of a claim, some courts have simply suspended the plaintiff's due diligence requirement when active fraudulent concealment is found. *See, e.g., Tomera v. Galt,* 511 F.2d 504, 510 (7th Cir.1975), *overruled on other grounds by Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1387 (7th Cir.1990). Under this subrule, the statute of limitations is tolled until the plaintiff actually discovers the cause of action. *Id.* Other courts would seem to excuse the diligence requirement when they note that successful concealment would fool even the most diligent hypothetical plaintiff. *See, e.g., Campbell v. Upjohn Co.,* 676 F.2d 1122, 1128 (6th Cir.1982) ("Actions such as would deceive a reasonably diligent plaintiff will toll the statute."); *Ohio v. Peterson,*

*Lowry, Rall, Barber & Ross,* 651 F.2d 687, 694 (10th Cir.) (same), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *Anderson,* 775 P.2d at 1204–06 (affirming trial court ruling that law firm members had no duty to inquire further into another member's receipt of undisclosed client fees, even though member's office day planner recorded time spent for such fees).

In essence, the Amtec plaintiffs ask us to adopt one of these subrules to find that the statute of limitations was tolled in their case as a matter of law until April of 1991. However, we decline to introduce such artificial legal subrules into this area of the law. When a defendant has concealed a plaintiff's cause of action, the questions of when a plaintiff should reasonably begin inquiring about the defendant's wrongdoing and whether, once on notice, the plaintiff has acted with reasonable diligence to discover the facts forming the basis of the cause of action are all highly fact-dependent legal questions. If we were to attempt to determine as a matter of law the effect of any particular set of facts, as must be done to apply the various subrules other courts have developed, we would only invite appeals and the development of a body of fact-dependent case law that would be beyond the appellate courts' ability to keep consistent. Under similar circumstances, we have previously observed that "we cannot hope to work out a coherent statement of the law through a course of [de novo] decisions." *Pena,* 869 P.2d at 938. And that is precisely what we would be attempting to do if we were to apply one of the above subrules to toll the statute of limitations for the Amtec plaintiffs until April of 1991.

For the reasons described in *Pena,* we decline to adopt any of the subrules mentioned above, and we leave as the law the general rule that a plaintiff must make a prima facie showing of fraudulent concealment and then demonstrate that, given the defendant's actions, a reasonable plaintiff would not have discovered his or her claim earlier. The application of this legal rule to any particular set of facts is necessarily a matter left to trial courts and finders of fact. In making this determination, the factors

that underlie the more specific subrules discussed above may be relevant to the extent that they highlight considerations pertinent to the difficulty a plaintiff may have in recognizing and diligently discovering a cause of action when a defendant affirmatively and fraudulently conceals it.

■ In so holding, we explicitly acknowledge that weighing the reasonableness of the plaintiff's conduct in light of the defendant's steps to conceal the cause of action necessitates the type of factual findings which preclude summary judgment in all but the clearest of cases. Thus, summary judgment is appropriate only when the facts fall on two opposite ends of a factual continuum: either (i) when the facts are so clear that reasonable persons could not disagree about the underlying facts or about the application of the governing legal standard to the facts or (ii) when the facts underlying the allegation of fraudulent concealment are so tenuous, vague, or insufficiently established that they fail to raise a genuine issue of material fact as to concealment, with the result that the claim fails as a matter of law. *See Harline v. Barker,* 912 P.2d 433 (1996) (discussing propriety of summary judgment to decide issues of proximate cause).

■ Returning to the instant case, we reject the trial court's legal conclusion that the two letters from Berenda and Thomas demonstrated sufficient suspicion of Langford's activities so as to place Berenda, Thomas, and Whitehouse under a legal duty to make inquiries, which in turn would have led to the discovery that Langford had misappropriated the Ghostwriter. We confronted a similar factual situation in *Chapman v. Primary Children's Hospital,* 784 P.2d at 1183–85. In *Chapman,* a hospital and a doctor claimed that a letter written by the parents of an alleged medical malpractice victim to the doctor some eight years before the parents filed suit was evidence of the parents' suspicion of the hospital's negligence. *Id.* at 1185. The letter referred specifically to "negligence" and supported the hospital's inference that the reference was to the parents' suit against the hospital. *Id.* However, when one of the parents contended in an affidavit that the reference was to a separate malpractice suit

against different physicians, we found that the letter's language supported the parents' case at least as strongly as it did the hospital's and therefore that a genuine issue of material fact existed which precluded summary judgment. *Id.* We said:

> It may be a close call whether, for example, the [parents] were sufficiently alerted to the possibility of medical malpractice [when it occurred] to start the statute of limitations running or whether, assuming the [parents'] allegations are true, they should reasonably have disregarded [the doctor's] representations and made an independent inquiry. Such close calls are for juries, not judges, to make.

*Id.* at 1186.

In the present case, we agree that Berenda's first letter reflects suspicion of Langford and supports an inference that Berenda suspected misappropriation of assets such as the Ghostwriter. However, the letter equally supports Berenda's contention that his threats and accusations were an attempt to "find out if Amtec was really broke" in the context of an ugly negotiation over the price of Berenda's shares in Amtec. Similarly, Berenda's second letter, cosigned by Thomas, even more clearly reflects their disappointment and recriminations over changes to Langford's original proposal for the merger with Vintage. In light of Langford's failure to disclose the Ghostwriter licensing agreement when he was allegedly under a duty to disclose it, his express statement to Thomas that the Ghostwriter had "fizzled," his keeping Ghostwriter records in his personal files, and his telling Berenda that further questions would lead to a collapse of the merger agreement, we cannot agree that, as a matter of law, the two letters demonstrate sufficient suspicion of Langford's misappropriation of the Ghostwriter to start the running of the statute of limitations on that cause of action, given Langford's efforts to conceal it.

Further, the letters themselves demonstrate Berenda's and Thomas' efforts to begin an inquiry into Langford's management practices, at a time when they were entitled to rely on Langford's answers because of his fiduciary duty to disclose his conflicting interests to his co-directors. Even if we were,

in hindsight, to hold that Berenda and Thomas should have inquired more specifically about the worth of Amtec, perhaps by demanding an accounting, it is not clear whether an accounting or its equivalent would have revealed the misappropriation of the Ghostwriter, because Langford kept certain records relating to it in noncorporate files. Therefore, while it may be "a close call," *see id.,* we cannot agree that, as a matter of law, the two letters demonstrate that Berenda and Thomas should have suspected Langford's wrongdoing or, more importantly, that an inquiry would reasonably have led to discovery of the misappropriation.

We also reject Langford's contention that Whitehouse had "the means of knowledge" because Whitehouse could have made a telephone call to Ohio Arts "in October 1989 [which] would have revealed the status of Ghostwriter." Langford argues that Whitehouse's "knowledge" should be imputed to Amtec, Berenda, and Thomas. Even if we agreed with this argument, *see United Park City Mines,* 870 P.2d at 886, we disagree that the undisputed facts demonstrate that Whitehouse reasonably suspected wrongdoing so as to trigger his duty to inquire more fully. The facts suggest that in the fall of 1989 and in the winter of 1990, Langford and Whitehouse were attempting to cash out Berenda's and Thomas' shares as cheaply as possible. Viewing the facts and inferences therefrom in a light most favorable to the Amtec plaintiffs, Langford's statement that the benefits of the Ghostwriter project would then accrue to Langford and Whitehouse as the remaining shareholders of Amtec can be read as (i) denying, or at least covering up, the fact that Langford had already signed the Ghostwriter licensing agreement under which he personally was to receive the royalties and (ii) affirmatively misrepresenting that he was continuing to negotiate with Ohio Arts *on behalf of Amtec.* In light of Langford's continued fraudulent concealment of the misappropriation of the Ghostwriter, we cannot say as a matter of law that Whitehouse should have suspected Langford of wrongdoing and, therefore, that he should have inquired further. Without a reason to inquire into Langford's wrongdoing, it is far too speculative to hold that Whitehouse had the means, via a phone call to Ohio Arts, to discover the misappropriation.

Further, Langford failed to present undisputed facts demonstrating that Ohio Arts would have responded to such a phone call. Given that Ohio Arts had a licensing agreement that did not mention Amtec for a competitive product which it did not begin to manufacture for at least one more year, we cannot agree with the factual proposition that Ohio Arts would have disclosed Langford's misappropriation to Whitehouse. Therefore, on the facts before us, Whitehouse did not have the means of knowledge which is equivalent to knowledge.

■ Finally, the trial court erred in its additional conclusion of law that the Amtec plaintiffs had only until October of 1992 to bring this lawsuit. That conclusion assumes that (i) the statute of limitations began to run in October of 1989; (ii) Berenda, Whitehouse, and Thomas discovered Langford's misappropriation in April of 1991 and could have filed suit before October of 1992; and (iii) because they did not file suit until March of 1993, they filed after the statute expired. To support the trial court's reasoning, Langford relies on our statement that "the discovery rule does not apply to a plaintiff who becomes aware of his injuries or damages and a possible cause of action before the statute of limitations expires." *Atwood v. Sturm, Ruger & Co.,* 823 P.2d 1064, 1065 (Utah 1992); *see also Walker Drug Co.,* 902 P.2d at 1231 ("Before a period of limitations may be tolled under either of [the fraudulent concealment or exceptional circumstances] versions of the discovery rule, an initial showing must be made that the plaintiff did not know and could not reasonably have discovered the facts underlying the cause of action in time to commence an action within that period."); *Warren,* 838 P.2d at 1130 (same); *Brigham Young Univ. v. Paulsen Constr. Co.,* 744 P.2d 1370, 1374 (Utah 1987) (same).

Langford misses the point. In all of the above-cited cases, a plaintiff asked this court to toll a statute of limitations that contained no internal discovery rule. Thus, in each case, the question before this court was whether the discovery rule should apply to

toll an otherwise statutorily fixed limitations period. In each case, we refused to apply the discovery rule because each plaintiff knew of sufficient facts to bring an action prior to the expiration of the fixed limitations period but failed to do so. By contrast, in cases where we have applied the discovery rule to toll an otherwise fixed limitations period, this court has consistently held that the statute of limitations did not begin to run until the plaintiff discovered or should have discovered the facts constituting the cause of action. *O'Neal,* 821 P.2d at 1143.

In the instant case, Langford's summary judgment motion was based on a statute of limitations that expressly contains an internal discovery rule. *See* Utah Code Ann. § 78–12–27. By its own terms, that statute does not begin to run until "the discovery, by the aggrieved party, of the facts upon which ... the liability accrued." *Id.* Thus the question is not *whether* the discovery rule applies—it does by virtue of the statute—but *when* Berenda, Thomas, and Whitehouse discovered their cause of action and so triggered the running of the statute. Our holding today establishes that the statute could not have begun to run until the Amtec plain-tiffs were reasonably on notice to conduct an inquiry that would have reasonably led to the discovery of the misappropriation, given Langford's acts of concealment. Therefore, the date the statute began to run is yet to be determined should Langford continue to pursue his limitations defense. Accordingly, the trial court's conclusion that the Amtec plaintiffs had to file this suit prior to October of 1992 is erroneous.

In sum, we reverse the trial court's grant of summary judgment in favor of Langford and remand this case for further proceedings consistent with this opinion.

HOWE, DURHAM and RUSSON, JJ., concur in Chief Justice ZIMMERMAN'S opinion.

STEWART, Associate C.J., concurs in the result.