2001 UT 16

**Virginia HILL, Plaintiff and Appellant,**

v.

**Owen A. ALLRED, et al., Defendants and Appellees.**

**No. 981562.**

Supreme Court of Utah.

Feb. 23, 2001.

Rehearing Denied May 2, 2001.

Don S. Redd, Layton, Clark R. Nielsen, Salt Lake City, for plaintiff.

Ronald C. Barker, Salt Lake City, David K. Smith, Midvale, for defendants.

DURHAM, Justice:

¶ 1 Plaintiff Virginia Hill appeals the trial court's grant of summary judgment in favor of all defendants, with the exception of defendant John Putvin, on her claims of fraud in the purchase of a ranch, based on the expiration of the statute of limitations. This action was filed in August 1997; the underlying events took place in 1989 and 1990. Hill argues that the statute of limitations was tolled under the discovery rule because she could not reasonably have discovered the facts regarding the fraud until after November 1994. We reverse and remand.

## BACKGROUND

¶ 2 The facts alleged in this case present a complicated, convoluted, and contested sce-

nario involving many defendants over a period of time. From August 1989 to February 1990, Virginia Hill gave control of a substantial sum in cash to her uncle Daniel Jackson. At about this time, John Shugart and Jackson agreed "to hold" Hill's money for her for future investments, with Shugart acting as Hill's agent.

¶ 3 In November 1989, Shugart allegedly entered into an implied contract with Dennis Matthews and John C. Putvin. The contract provided that Matthews and Putvin would purchase the Desert Inn Ranch, located in southwestern Utah, on Hill's behalf, for $1,000,000, plus a $40,000 negotiation fee. On December 7, 1989, Shugart gave Matthews another $500,000 of Hill's money for the purchase. Hill alleges that all the defendants, including Matthews, Jeffery Norman,[1] and Putvin, conspired to convert, conceal, misrepresent, and commit fraud with this money.

¶ 4 Hill claims that Putvin, Matthews, Donna Sandmire, and Owen Allred, "Presiding Elder" of the Corporation of the Presiding Elder of the Apostolic United Brethren, held a meeting on November 13, 1989, individually and as agents of defendant Apostolic United Brethren, and during that meeting planned and conspired to fraudulently convert her money. A tape recording of this meeting was later given to one of Hill's investigators, Rod Williams, on December 21, 1994.[2] Sometime between November and December 1994, another one of Hill's investigators, John Llewellyn, secured possession of the tape. Hill alleges that she first discovered the identities of the people involved in the alleged conspiracy, including the defendants, when the tape was played for her in July 1995.

¶ 5 Hill alleges that defendants laundered her money through various conversions and acquisitions of property from November 1989 to December 1990, as follows: Glen Allred acquired Granite Ranch through the Red Cedar Corporation; Marvin Allred acquired the Rocky Ridge Subdivision; Matthews bought a 1989 Honda Acura for $21,000; James Sandmire established businesses named Automotive Specialties, Diamond Auto Sales, and Diamond Recreational Rental, and purchased real property for $110,000; James Sandmire executed two trust deeds worth $425,000 to Last Resort Enterprises, an alleged alter ego of Putvin; Matthews and Putvin delivered $30,000 to Lamoine Jensen, who in turn deposited the money into a Jensen Lumber Company bank account and later wrote a check for the same amount to "John Galt," an alias for Putvin; Putvin gave $20,000 or $30,000 in "tithing" to Owen Allred, who, after holding the money for an unknown period, wrote a check for $30,000 to "John Galt."

¶ 6 Hill maintains that she did not discover Shugart's transfer of $1.54 million in cash to Putvin and Matthews until February 1990, after most of the money had been allegedly laundered. Realizing that she did not have title to the ranch, Hill met first with Matthews, who informed her that "Mr. Putvin had absconded with all her money, 'every cent.'" Later, in early March 1990, Hill had another meeting, this time including Owen Allred, to find out where her money was located. This meeting was arranged by Ogden Kraut, acquainted with both Hill and Allred. At both meetings, Allred and Matthews swore that they did not have any of Hill's money. Thus, Hill claims she was misled regarding the whereabouts of her money on both occasions, saying that she relied on Allred's statements because of his position as a "prominent religious leader."

¶ 7 In April 1990, Royston Potter was retained by Shugart, as an agent of Hill, to

1. Although Matthews and Norman are not represented by counsel in this appeal and have not filed briefs, Hill has appealed from the trial court's order dismissing her action as to all defendants, except Putvin, who was not dismissed.

2. Exhibit "C", attached to Defendants' Reply in Support of their Motion to Dismiss, is an untitled piece of paper that purports to be part of a chronology of the facts in this case. This document provides the date for receipt of the tape of the November 13, 1989, meeting.

investigate and find the $1.54 million. After conducting surveillance and interviewing Matthews, Owen Allred, and James Sandmire, Potter reported back to Shugart in June 1990 that he was unable to track down Putvin or locate the money. Hill, accompanied by an attorney, went to the Washington County Sheriff's Office seeking assistance in finding Putvin and her money. Also in 1990, Internal Revenue Service investigators contacted Hill, informing her that they were investigating the whereabouts of her money and whether it had been obtained as "ill-gotten gain." Hill alleges that she got the "impression" that they were trying to locate her money and the persons who stole it. Later, both Hill and Shugart were called before a grand jury investigating the laundering involving Hill's money. At this time, Hill alleges, she learned that Putvin had left the country. Hill alleges that she again believed that the grand jury investigation was part of an attempt to recover her money.

¶ 8 Almost four years later, in November 1994, Hill retained two private investigators, Llewellyn and Williams, to find the missing money. Between the period of November and December 1994, Llewellyn interviewed Owen Allred three times. On the first occasion, Allred denied any knowledge pertaining to Hill's money. During the second interview, Allred allegedly admitted to having possession of Hill's money at one point in time, saying that "two men ... placed ... 'gobs and gobs' of money" in his wife's clothes closet, and that he later told somebody to remove the money. Allred could not remember the identity of any of these people. However, in Allred's affidavit, withdrawn approximately two months after it was initially filed with the court in this action (with no explanation for the withdrawal), he claims that he never had possession of Hill's money and was only led to believe that he did. During the third session, on approximately December 7, 1994, Llewellyn played a tape of the "conspiracy meeting" of November 13, 1989, for both Matthews and Allred. According-

ing to Llewellyn, during the interview, Allred agreed that the tape was accurate. Matthews denied nothing that he heard on the recording, and told Llewellyn that "when he and John Putvin were on the way back from St. George after obtaining the first million dollars, Putvin told him they were not going to give the money back." [3]

¶ 9 In December 1995, Williams, the other Hill investigator, had a telephone conversation with Jensen. Williams's affidavit states that during the conversation, Jensen admitted that he received $30,000 from Putvin and Matthews. He subsequently felt uncomfortable about holding the money and returned it, before Putvin's departure for New Zealand, by means of a check that Putvin requested be made out to "John Galt." Llewellyn also had several conversations with Jensen, but the dates of these meetings are not specified in his affidavit. The contents of the interviews were similar in nature to Williams's interview regarding the trail of the $30,000 Jensen had in his possession.

¶ 10 Llewellyn also had an interview with Norman, on an unspecified date, in which Llewellyn claims that Norman admitted his involvement in laundering money. Norman said that he cooperated in the money laundering out of fear, alleging Putvin had ties to organized crime. During a September 13, 1996, meeting between Owen Allred and Llewellyn, Allred confirmed that a $20,000 "tithing" amount he returned to Putvin was the same money that related to Norman's arrest and conviction.

¶ 11 Hill filed her action against defendants on August 29, 1997. Her amended complaint alleges that all of the defendants committed the following acts: fraudulent conversion or unjust enrichment, breach of implied contract, money laundering, fraudulent misrepresentation, racketeering, and intentional infliction of emotional harm. Hill further alleges that Owen Allred, Donna Sandmire, Matthews, Putvin, and the Apos-

---

**3.** Llewellyn does not specify in his affidavit whether Matthews stated this at the meeting where he played the tape for Matthews, or subsequent to the meeting.

tolic United Brethren committed fraud and/or constructive fraud and engaged in civil conspiracy. While the alleged money laundering claim is against all the defendants, there are no specific allegations against Donna Sandmire or Norman.

## STANDARD OF REVIEW

¶ 12 Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Utah R. Civ. P. 56(c); *Higgins v. Salt Lake County,* 855 P.2d 231, 235 (Utah 1993). The trial court's resolution of the legal issues is accorded no deference since entitlement to summary judgment is a question of law. *See Berenda v. Langford,* 914 P.2d 45, 50 (Utah 1996). "We determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Id.* (internal quotation marks omitted). Furthermore, "in reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.* at 47 (internal quotation marks omitted).

## ANALYSIS

¶ 13 Defendants argue that (1) Hill has not pled fraud with particularity, and (2) she knew, or should have known, about her causes of action against defendants no later than February 1990. Hill alleges that she was intentionally misled by various defendants regarding what happened to her money and who was responsible, and that she had no reason to know she had claims against anybody but Putvin until November 1994.

## I. FRAUD PLEADING

¶ 14 The Utah Rules of Civil Procedure provide that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Utah R. Civ. P. 9(b). While "[w]e have stressed ... that mere conclusory allegations in a pleading, unsupported by a recitation of relevant surrounding facts, are insufficient to preclude ... summary judgment," *Chapman v. Primary Children's Hospital,* 784 P.2d 1181, 1186 (Utah 1989), a "sufficiently clear and specific description of the facts underlying the [plaintiff's] claim of fraudulent concealment...." will satisfy the requirements of rule 9(b). *Id.* Our liberalized pleading rules are designed "to afford parties the privilege of presenting whatever legitimate contentions they have pertaining to their dispute, subject only to the requirement that their adversary have fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved." *Williams v. State Farm Ins. Co.,* 656 P.2d 966, 970–971 (Utah 1982) (internal quotation marks omitted). Hill alleges specific facts, many related above, regarding her attempt to purchase a piece of real property with the help of several defendants in this action, the manner in which the transaction was initiated, and the unfolding of events related to her attempt to secure ownership of the property. We hold that Hill did plead fraud with the particularity required by rule 9(b).

## II. DISCOVERY RULE

¶ 15 In most circumstances, a cause of action accrues "upon the happening of the last event necessary to complete the cause of action." *Myers v. McDonald,* 635 P.2d 84, 86 (Utah 1981). Certain circumstances, however, raise the possibility that the discovery rule may toll the limitations period "until the discovery of facts forming the basis for the cause of action." *Id.* The discovery rule is applicable when it is mandated by statute, when a defendant has concealed a plaintiff's cause of action, or when exceptional circumstances exist. *See Williams v. Howard,* 970 P.2d 1282, 1285 (Utah 1998). Application of the discovery rule prevents the limitations period from beginning to run until the facts forming the foundation for the cause of action are discovered. *See id.* at 1284.

¶ 16 Defendants moved for summary judgment on the ground that Hill's action was time-barred. While Hill has alleged a number of different claims, they all flow from her fraud allegations regarding the initial agreement to purchase a ranch in southwestern Utah, and what subsequently happened to the money that her agents gave to two of the defendants. Thus, the relevant statute to examine for statute of limitations purposes is Utah Code Ann. § 78–12–26(3) (1996). That section provides a three-year statute of limitations period for, among other things:

> relief on the grounds of fraud or mistake; except that *the cause of action in such case does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake.*

(Emphasis added.) Thus, in an action alleging fraud, the statute expressly provides that accrual of the cause of action is not complete until discovery of the pertinent facts. *See Berenda v. Langford*, 914 P.2d 45, 56 (Utah 1996). The key inquiry is thus when Hill discovered her cause of action, thereby triggering the running of the limitations period. *See id.* Additionally, Hill alleges that several of the defendants actively engaged in concealing her cause of action. This alleged concealment is critical to the statute of limitations question.

¶ 17 This court has previously distinguished between situations where there were no allegations that defendants engaged in acts of concealment, *see United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 890 (Utah 1993) (refusing to toll limitations period for shareholders where proxy statement contained sufficient information to provide notice of the need for further inquiry), and those in which "a plaintiff alleges that a defendant took affirmative steps to conceal a plaintiff's cause of action," *Berenda*, 914 P.2d at 51. In the second situation, "the plaintiff can avoid the full operation of the discovery rule by making a prima facie showing of fraudulent concealment and then demonstrating that given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier." *Id.*

¶ 18 Fraudulent concealment under the discovery rule requires determining (i) when a plaintiff would reasonably be on notice to inquire into a defendant's bad acts despite defendant's attempts to hide those acts; and (ii) whether a plaintiff, once on notice, reasonably would have discovered, with due diligence, the facts on which the cause of action is based despite the defendant's efforts to hide those facts. *See Berenda*, 914 P.2d at 52. As we stated in *Berenda*:

> [w]hen a defendant has concealed a plaintiff's cause of action, the questions of when a plaintiff should reasonably begin inquiring about the defendant's wrongdoing and whether, once on notice, the plaintiff has acted with reasonable diligence to discover the facts forming the basis of the cause of action are all highly fact-dependent legal questions. . . . [W]e explicitly acknowledge that weighing the reasonableness of the plaintiff's conduct in light of the defendant's steps to conceal the cause of action necessitates the type of factual findings which preclude summary judgment in all but the clearest of cases.

*Id.* at 53–54; *see also Chapman v. Primary Children's Hosp.*, 784 P.2d 1181, 1186 (Utah 1989) (stating that in medical malpractice action "close call[s]" of whether plaintiffs acted reasonably in failing to discover the cause of action "are for juries, not judges, to make").

¶ 19 Hill has submitted the affidavits of five separate people to bolster the allegations in her amended complaint. She has alleged two meetings in which defendants lied to her regarding who stole her money and where the money went. She submitted sworn testimony from the investigator hired in 1990 to track down Putvin, the man she then believed to be solely responsible for the loss of her money, that, taken in the light most favorable to the plaintiff, demonstrates Hill believed that Putvin and her money had disappeared. She showed diligence by going to the county sheriff to seek further help in finding Putvin and her money. Only after these investigations, and frustrated in her attempts to locate Putvin, did she give up,

until July 1995, when she heard a tape recording that contained evidence of facts quite different from those defendants had described several years earlier. Taking the facts in the light most favorable to plaintiff, it appears that only at that point did she discover the underlying facts that defendants concealed in the 1990 meeting—the facts that gave her a cause of action against them. Hill has therefore met her burden of making a prima facie showing of fraudulent concealment, after alleging that defendants took affirmative steps to conceal her cause of action.[4]

¶ 20 Thus far, all that defendants have done to show that Hill did not act reasonably in inquiring into defendants' wrongdoing, or act diligently to discover the facts forming the basis of her cause of action, is to submit, then withdraw, an affidavit by Owen Allred, in which he asserts he does not remember the March 1990 meeting with Hill and others.[5] This was the meeting that Ogden Kraut swears that he arranged, due to his acquaintance with Allred, at which Kraut, Hill and Allred were present. Distinguishing among these conflicting stories is precisely the type of fact-finding that *Berenda* stated was inappropriate for this court, or indeed for the trial judge on summary judgment. *Berenda*, 914 P.2d at 53. This is not a case where summary judgment is warranted, because the facts are either

> so clear that reasonable persons could not disagree about the underlying facts or about the application of the governing legal standard to the facts or ... the facts underlying the allegation of fraudulent concealment are so tenuous, vague, or insufficiently established that they fail to raise a genuine issue of material fact as to concealment, with the result that the claim fails as a matter of law.

*Id.* at 54.

¶ 21 The trial court mistakenly relied on the case of *Anderson v. Dean Witter Reyn-*

*olds, Inc.*, 920 P.2d 575, 579–80 (Utah Ct. App.1996), to find that Hill did not fulfill her duty to inquire, based upon what she knew in 1990. The plaintiff in *Anderson* did nothing for six years after she was told of the losses she suffered in her stock trading account. *See id.* at 579. It was this inaction that caused the court in *Anderson* to conclude that, even under *Berenda's* caution against granting summary judgment in highly fact-dependent cases, that *Anderson* was indeed the rare, clear case that warranted an exception to the general rule. *See id.* Additionally, the *Anderson* defendants did not engage in concealing plaintiff's loss. Thus, the instant case is distinguishable on two major grounds: Hill alleges both that she actively took steps to inquire about her loss and that several defendants actively concealed the circumstances surrounding her missing money.

### CONCLUSION

¶ 22 The issue in this case is when Hill should have discovered her cause of action. We conclude that, at the very least, an issue of fact exists as to whether that date could have been earlier than the date Hill's investigators received the tape recording (November 1994). We therefore reverse the trial court's grant of summary judgment as to all defendants and remand for further proceedings.

¶ 23 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURRANT and Justice WILKINS concur in Justice DURHAM'S opinion.

---

4. Hill also alleges that each of the defendants was involved in the conspiracy to convert and/or launder her money and that they benefitted from such conversion and money laundering.

5. Owen Allred does, however, recall "with unusual clarity" that he never received "some amount between twenty thousand dollars and thirty thousand dollars in cash from either Dennis Matthews or John Putvin," or purchased a cashier's check for $20,000 and deposited it into a bank account for "John D'Anconia Galt." This is an instance of one among many disputed material facts contained in the record in this case.