**RUSSELL/PACKARD DEVELOPMENT, INC., a California corporation; and Lawrence M. Russell, an individual, Plaintiffs and Appellants,**

v.

**Joel M. CARSON, an individual; William Bustos, an individual; and John Thomas, an individual, Defendants and Appellees.**

No. 20020546–CA.

Court of Appeals of Utah.

Sept. 18, 2003.

**618**

Heather S. White, Michael R. Carlston, and R. Brent Stephens, Snow Christensen & Martineau, Salt Lake City, for Appellants.

Keith W. Meade, Cohne Rappaport & Segal, and Craig G. Adamson, Dart Adamson, Donovan & Hansen, Salt Lake City, for Appellees.

Before Judges BILLINGS, BENCH, and THORNE.

## OPINION

BILLINGS, Associate Presiding Judge:

¶ 1 Russell/Packard Development, Inc., and Lawrence Russell (collectively, Russell) appeal from the district court's order granting motions to dismiss in favor of Joel Carson, William Bustos, and John Thomas. We reverse and remand.

## BACKGROUND

¶ 2 In 1996, Lawrence Russell was the principal shareholder and chief executive officer of Russell/Packard Development, Inc., a California corporation[1] engaged in real estate development in California. When Mr. Russell became interested in developing residential real estate in Utah, he teamed with John Thomas (Thomas), a Utah real estate agent and a managing member of Premier Homes, L.C., to organize a Utah limited liability company called PRP Development, L.C. (PRP). Thomas was the manager of PRP and hence a fiduciary of Russell and PRP. PRP began pursuing real estate development activities in Utah.

¶ 3 In 1996, Saratoga Springs Development, L.C. (Saratoga), a company owned by Lynn Wardley, was developing and marketing land for residential construction. Saratoga owned seventy-two undeveloped twin-home lots (the lots) in the city of Saratoga Springs, Utah. Saratoga retained the brokerage services of Wardley Better Homes and Gardens Brokerage Co. (Wardley) to market and sell the lots. Dan Cary (Cary), a Wardley agent, was the listing agent for the lots. Joel Carson (Carson) and William Bustos (Bustos) were also real estate agents with Wardley. Unbeknownst to Russell, Carson had a business relationship with Bustos and Bustos had previously engaged in real estate dealings with Thomas. Also unbeknownst to Russell, Thomas owed Bustos money from previous business dealings. Thomas retained Carson on behalf of PRP and Russell to locate and review real estate proposals for purchase and development by PRP. As such, Carson became a fiduciary of PRP.

¶ 4 In the summer of 1996, Carson, Thomas, and Bustos learned of the availability of the Saratoga lots. At the urging of Carson and Bustos, Thomas approached Cary about purchasing the lots from Saratoga through PRP.

¶ 5 However, in the fall of 1996, Carson, Thomas, and Bustos, through an entity known as CMT, Inc. (CMT), made a separate offer to purchase the lots from Saratoga for $25,000 per lot. Carson told Cary that CMT was affiliated with or owned by Russell and PRP. Throughout the negotiations, Carson and Thomas, through their actions and representations to Saratoga, created the appearance that PRP was actively pursuing the purchase of the lots. Consequently, Wardley and Saratoga believed they were negotiating the purchase of the lots with PRP directly. To further disguise CMT's illegitimacy, Carson, Thomas, and Bustos misappropriated Russell's proprietary plans to develop the lots and presented them to Saratoga as their own. As a result of the same conduct, Rus-

**1.** Russell/Packard Development, Inc., was licensed through the Utah Department of Commerce to do business in Utah as a foreign corporation.

sell erroneously believed CMT was owned by, affiliated with, or part of Saratoga.

¶ 6 In fact, during the negotiations and execution of the PRP contract, CMT was merely a fictitious name used by Carson, Thomas, and Bustos, having no legal status in Utah or elsewhere.[2] On November 4, 1996, CMT and Saratoga executed a real estate contract listing Cary as the agent for Saratoga and Carson as the agent for CMT. The CMT contract was signed by Saratoga's authorized agent and by "Charles Perez" on behalf of CMT.[3] Saratoga and CMT closed on the CMT contract the same day they executed it, with Saratoga still erroneously believing it was contracting with PRP through PRP's affiliate, CMT. The title company CMT used to close the transaction received an earnest money wire in the amount of $10,000 from an entity known as Poe Investments, L.C. (Poe), whose members were Carson and Bustos.[4] At closing, Bustos received a check for part of this $10,000 earnest money payment.

¶ 7 After the CMT contract closed on November 4, 1996, Thomas—acting for PRP—made an offer to purchase the lots from CMT for $30,000 per lot. PRP and CMT executed a real estate contract (the PRP contract) on November 8, 1996. Thomas signed on behalf of PRP. "Charles Perez" again signed on behalf of CMT. Carson acted as the real estate agent for both PRP and CMT on the PRP contract. The terms of the PRP contract were identical to those of the CMT contract, except that the price per lot was $5,000 higher. By failing to reveal to Russell, PRP, and Saratoga that they were acting as agents and principals for CMT at the same time they were acting as agents and fiduciaries of Russell and PRP, Carson, Thomas, and Bustos successfully effectuated a "flip purchase and sale," and pocketed $360,000 in the process. Neither Russell nor Saratoga knew what had occurred. Howev-

er, CMT was listed as the seller both in the PRP contract and in the chain of title on the lots.

¶ 8 In spring 2000, an accountant for Saratoga questioned CMT's true role in the 1996 transactions involving the lots.[5] Suspecting a "flip purchase and sale" had occurred, Saratoga initiated discussions with Russell wherein Russell learned for the first time that CMT was not an agent for Saratoga. Subsequently, Russell conducted further investigation concerning the ownership and control of CMT and the circumstances surrounding PRP's purchase of the lots.

¶ 9 On November 30, 2001, Russell filed a complaint against Carson, Thomas, and Bustos alleging fraud, breach of fiduciary duty as to Carson and Thomas, civil conspiracy to defraud, commercial bribery, unjust enrichment, conversion and misappropriation of proprietary property, breach of principal-agent relationship as to Carson and Thomas, and intentional interference with prospective economic relations. Carson, Thomas, and Bustos filed motions to dismiss asserting a number of grounds for dismissal. On June 10, 2002, the district court dismissed Russell's claims with prejudice. Russell appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 10 Russell argues the district court erred in dismissing its claims against Carson, Thomas, and Bustos (collectively, the Appellees). "When determining whether a trial court properly granted a rule 12(b)(6) motion to dismiss, we accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the plaintiff." *Saint Benedict's Dev. Co. v. Saint Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991). "Because the propriety of a 12(b)(6) dismissal is a question of law, we

---

2.  CMT, Inc. was incorporated as a California corporation on December 5, 1996, after the CMT contract was signed. CMT has never been registered to do business in the state of Utah.

3.  A person named "Charles Perez" is believed to have been associated with CMT, though Russell alleges it is unsure how.

4.  Poe was organized in Utah on July 19, 1996, and involuntarily dissolved on August 22, 1997.

5.  By this time, Russell and Thomas had dissolved PRP. In the 1997 dissolution, Russell purchased all rights, title, and interest in the PRP contract, including the right to purchase the lots pursuant to the terms of the contract.

give the trial court's ruling no deference and review it under a correctness standard." *Russell v. Standard Corp.*, 898 P.2d 263, 264 (Utah 1995)'(quotations and citations omitted). We "will affirm the trial court's decision only if it appears [Russell] cannot prove any set of facts in support of [its] claims." *Dansie v. Anderson Lumber Co.*, 878 P.2d 1155, 1156 (Utah Ct.App.1994).[6]

## ANALYSIS

### I. Timeliness of Claims

#### A. Statutes of Limitations

¶ 11 Under Utah law, Russell's claim for fraud is subject to a three-year statute of limitations. *See* Utah Code Ann. § 78–12–26(3) (2002). Russell's claims for breach of fiduciary duty, civil conspiracy, unjust enrichment, conversion and misappropriation, breach of principal-agent relation, and intentional interference with prospective economic relations (collectively, the four-year claims) are subject to a four-year statute of limitations. *See id.* § 78–12–25(3) (2002). Russell concedes that, absent tolling, its fraud claim expired on November 7, 1999, its four-year claims expired on November 7, 2000, and thus its November 30, 2001 complaint was untimely.

#### B. The Discovery Rule

¶ 12 In most cases "a cause of action accrues" and the "statutes of limitations begin running upon the happening of the last event necessary to complete the cause of action." *Spears v. Warr*, 2002 UT 24, ¶ 33, 44 P.3d 742 (quotations and citations omitted). Moreover, "mere ignorance of the existence of a cause of action does not prevent the running of the statute of limitations." *Warren v. Provo City Corp.*, 838 P.2d 1125, 1129 (Utah 1992) (quotations and citations

omitted). Russell concedes that, absent tolling through application of the discovery rule, "the point at which [Russell] reasonably should [have] known" of its legal injuries is November 8, 1996, the day PRP and CMT executed the PRP contract. *Spears*, 2002 UT 24 at ¶ 32, 44 P.3d 742.

¶ 13 However, in some cases, "the discovery rule tolls the limitations period until facts forming the basis for the cause of action are discovered." *Id.* Utah courts apply the discovery rule

(1) in situations where the discovery rule is mandated by statute; (2) in situations where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct; and (3) in situations where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action.

*Id.* (quoting *Warren*, 838 P.2d at 1129). Russell contends the limitation periods were tolled because: (1) the discovery rule applies to a claim for fraud by statutory mandate; and (2) the Appellees' concealment justifies application of the concealment prong of the discovery rule to Russell's four-year claims.

#### 1. Fraudulent Concealment

¶ 14 In *Berenda v. Langford*, 914 P.2d 45 (Utah 1996), our supreme court noted that in cases *not involving allegations of concealment*, inquiry notice on the part of the plaintiff is enough to trigger the running of the limitations period. *See id.* at 51–52 (citing *United Park City Mines Co. v. Greater Park City, Co.*, 870 P.2d 880, 889 (Utah 1993) (refusing to toll the statute of limitations where a proxy statement provided sufficient

---

6. The Utah Rules of Civil Procedure provide that "[t]he [district] court shall ... issue a brief written statement of the ground for its decision on all motions granted under ... 12(b)." Utah R. Civ. P. 52(a) (citing Utah R. Civ. P. 12(b)). While rule 52(a) allows for brevity in such supporting statements, we have specifically condemned the practice employed by the district court in this case wherein the court merely grants the motion "for the reasons set forth in the [prevailing party's] supporting memorandum ... [without] ex-

plain[ing] the basis for its decision." *Gabriel v. Salt Lake City Corp.*, 2001 UT App 277, ¶ 9, 34 P.3d 234. Given the complexity of the issues in this case, we could reverse and remand based solely on the district court's failure to explain the basis of its decision. However, in the interest of expediting this case, we proceed to the merits. Nonetheless, we urge trial courts to explain the basis of their decisions when there are multiple issues before the court.

information to put shareholders on notice of the need for further inquiry)). Hence, absent concealment, the statutes of limitations on Russell's claims began running in 1996 when Russell was put on notice of CMT's involvement by the PRP contract's closing papers and the subsequently recorded deeds. *See Johannessen v. Canyon Road Towers Owners Ass'n,* 2002 UT App 332, ¶ 23, 57 P.3d 1119 ("Constructive notice is imparted when documents are properly recorded." (quotations and citation omitted)).

▮ ¶ 15 "However, under our case law the rule is otherwise when a plaintiff alleges that a defendant took affirmative steps to conceal the plaintiff's cause of action...." *Berenda,* 914 P.2d at 51. In such a situation, the concealment prong of the discovery rule applies to toll the statute of limitations on the plaintiff's claims, regardless of inquiry or constructive notice. *See Seale v. Gowans,* 923 P.2d 1361, 1365 (Utah 1996). "[U]nder the discovery rule, 'it is the knowledge of injury' which triggers the statute, 'not notice of probable or possible injury.' " *Id.* (citation omitted). If the plaintiff can make "a prima facie showing of fraudulent concealment and then demonstrate that, given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier," the statute of limitations is tolled. *Berenda,* 914 P.2d at 51

(citing *Vincent v. Salt Lake County,* 583 P.2d 105, 107 (Utah 1978) (holding that the plaintiff's reasonable reliance on the defendant's misrepresentations tolled the statute of limitations until discovery of the cause of the damage) (other citations omitted)).[7]

a. Threshold Issue

¶ 16 "The first step in determining whether the discovery rule applies is to examine whether [Russell] made the threshold showing that [Russell] did not know, nor should have known," of its causes of action against the Appellees prior to being put on notice of a potential fraudulent transaction by Saratoga in spring 2000. *Sevy v. Security Title Co.,* 902 P.2d 629, 634 (Utah 1995); *see also O'Neal v. Division of Family Servs.,* 821 P.2d 1139, 1144 (Utah 1991) (noting that "a threshold showing that [the plaintiff] did not know and could not reasonably have known of the existence of a cause of action ... seem[s] a definitional prerequisite to reliance on any version of the discovery rule").

¶ 17 The Utah Supreme Court has held that a plaintiff's actual knowledge of a cause of action prevents the plaintiff from satisfying the threshold showing. *See O'Neal,* 821 P.2d at 1144 (citing *Brigham Young Univ. v. Paulsen Constr. Co.,* 744 P.2d 1370, 1374 (Utah 1987); *Auerbach Co. v. Key Sec. Po-*

---

7. The Appellees continue to argue that because Russell was put on notice of its claims in spring of 2000—several months before the four-year statutes of limitations expired in summer 2000—Russell was obligated to file its complaint before the running of the statute. The Appellees reason that because Russell did not file its complaint until November 2001, Russell's claims are time-barred. To support this reasoning, the Appellees cite *Atwood v. Sturm, Ruger & Co.,* 823 P.2d 1064 (Utah 1992) and *Brigham Young Univ. v. Paulsen Construction Co.,* 744 P.2d 1370 (Utah 1987). However, both of these cases are factually distinguishable from this case because neither involved allegations of fraudulent concealment.

In *Atwood,* the supreme court held that "[w]hile the discovery rule has often been applied to give a plaintiff the opportunity to file his action after learning certain critical facts, the discovery rule has no application here" where the plaintiff "d[id] not suggest any reason why the action could not have been filed between the spring of 1988"—when the plaintiff learned of his cause of action—"and October 11 of that year"—when the statute of limitations expired on his claim. 823 P.2d at 1065. Unlike the plaintiff

in *Atwood,* Russell has alleged fraudulent concealment as the reason Russell could not file its claims prior to summer 2000.

In *Brigham Young,* the supreme court refused to apply the discovery rule to toll the statute of limitations because the plaintiff "knew of its cause of action ... three and a half years before the limitations period expired," and where "an action easily could have been filed between the date of discovery and the end of the limitation period." 744 P.2d at 1374. Again, unlike Russell, the plaintiff in *Brigham Young* did not allege fraudulent concealment as a justification for filing suit after the statute of limitations ostensibly expired.

Hence, in *Atwood* and *Brigham Young,* the supreme court refused to apply the discovery rule because there were no allegations of fraud and because in both cases the plaintiffs could have filed prior to the running of the limitations period. Our reading of Utah law leads us to conclude that this rule does not apply here where Russell alleged fraudulent concealment. As we discuss in detail later in this section, we conclude that *Berenda v. Langford,* 914 P.2d 45 (Utah 1996), controls this case.

*lice, Inc.,* 680 P.2d 740, 743–44 (Utah 1984); *Becton Dickinson & Co. v. Reese,* 668 P.2d 1254, 1257 (Utah 1983); *Lord v. Shaw,* 665 P.2d 1288, 1290–91 (Utah 1983)). In the case before us, neither party alleges, nor does the record reflect, that Russell had or should have had actual knowledge of its claims against the Appellees at the time of the execution of the PRP contract.

¶ 18 However, there is no dispute that the PRP contract and the deeds for the lots indicate CMT's involvement in the transactions. The Appellees argue that because CMT was named in these documents, Russell should have been aware of its injury and cannot satisfy the threshold showing.

¶ 19 The case of *Sevy v. Security Title Co.,* 902 P.2d 629 (Utah 1995), is instructive. In *Sevy,* the plaintiffs satisfied the threshold showing even where there were "some undisputed facts indicat[ing] that [the plaintiffs] should have become aware of their injury at closing." *Id.* at 634, 636 (quotations and citation omitted). In that case, the plaintiff was awarded damages by the district court for a title company's negligent failure to deliver stock certificates to the plaintiff at closing, pursuant to the terms of a real estate purchase contract.[8] *See id.* at 631. Even though the statute of limitations would normally have run on the plaintiff's claim, the plaintiff asserted the discovery rule applied to toll the statute of limitations. *See id.* at 634. The plaintiff contended that he met the discovery rule's threshold showing—that he did not and should not have known of the negligence at the time of closing—because the recording of a trust deed led him to believe his security interest was perfected regardless of the defendant title company's failure to deliver the stock certificates. *See id.* at 636. The defendant title company argued that the plaintiff should have known of the negligence, and that his security interest was not perfected at closing when no stock certificates were forthcoming. *See id.* at 634. Noting that the district court's finding was a question of fact, *see id.* at 634, the

*Sevy* court affirmed the district court's ruling, holding that despite evidence tending to show that the plaintiff should have known of his claim upon the defendant title company's failure to deliver the stock certificates, the plaintiff "neither knew nor should have known of [the defendant title company's] negligence until after the statute of limitations period had run." *Id.* at 636.

¶ 20 Similarly in our case, Russell alleges that despite the presence of CMT's name in the closing documents and the recorded deeds, Russell did not and should not have known of its claims at closing, and therefore that the threshold requirement is met for application of the discovery rule. Russell argues it is commonplace to use multiple legal entities in complex development transactions, and therefore the Appellees' use of CMT's name did not, of itself, alert Russell of any potential or actual problems. Because of the standard of review on a rule 12(b)(6) dismissal, we accept Russell's assertions that it should not have known of its claims simply because CMT was listed in the PRP contract and the deeds. Hence, we conclude Russell has satisfied the threshold showing for purposes of surviving a motion to dismiss.

b. The Concealment Prong of the Discovery Rule

¶ 21 Our supreme court has held that application of the concealment prong of the discovery rule to toll a statute of limitations requires the plaintiff to "make a prima facie showing of fraudulent concealment and then demonstrate that, given the defendant's actions, a reasonable plaintiff would not have discovered his or her claim earlier." *Berenda v. Langford,* 914 P.2d 45, 53 (Utah 1996). This standard requires consideration of "the difficulty a plaintiff may have in recognizing and diligently discovering a cause of action when a defendant affirmatively and fraudulently conceals it." *Id.* at 54. Significantly, the *Berenda* court "explicitly acknowledge[d]

---

8. Because the certificates were never delivered, the plaintiff's security interest in the shares was not perfected and because of subsequent transfers of the stock certificates, a third party sought to foreclose on the stock and sued to have the district court declare the third party's security interest was valid, perfected, and free from claims by the plaintiff. *See Sevy v. Security Title Co.,* 902 P.2d 629, 631 (Utah 1995).

that weighing the reasonableness of the plaintiff's conduct in light of the defendant's steps to conceal the cause of action necessitates the type of factual findings which preclude summary judgment in all but the clearest of cases." *Id.* at 53. "Close calls are for juries, not judges, to make." *Id.* at 54 (quotations and citations omitted).

¶ 22 To support the contention that the Appellees concealed their wrongful conduct after defrauding Russell via the "flip purchase and sale," Russell alleges in its complaint that:

[ ] At the time the CMT contract, signed on November 4, 1996, and the PRP contract, signed on November 8, 1996, were executed, Carson, Bustos, and Thomas set on a course of conduct through agreement to conceal from plaintiffs and Saratoga CMT's relationship to the defendants and CMT's lack of relationship to the plaintiffs and Saratoga.

[ ] This concealment was a necessary part of the scheme and device to permit the CMT contract to be signed by Saratoga on November 4, 1996, and to "flip the sale" to PRP on November 8, 1996.

[ ] This intentional concealment and failure to disclose to plaintiffs the fact that CMT was not owned by or controlled through Saratoga or, as to Saratoga, CMT was not owned by or in the control of plaintiffs, plaintiffs and Saratoga would not have permitted the flip purchase and sale through CMT while Carson and Thomas were acting as agents and fiduciaries of plaintiffs or to benefit Bustos.

[ ] Plaintiffs did not discover that CMT was not the agent for ... Saratoga, in connection with the sale of the lots, until spring of 2000, when an accountant working for Saratoga discovered the possibility of a flip sale and purchase which prompted discussions between Russell on the one

hand, and a representative of Saratoga on the other hand.

[ ] At all times previous to that, defendant formulated a scheme in which plaintiffs were introduced to Saratoga by the defendants and always referred to as the builder or buyer, and Saratoga's representatives were introduced to plaintiffs by the defendants and always referred to as the seller or developer.

[ ] On information and belief, in the spring of 2000, an accountant for Saratoga questioned the ownership or control status of CMT, in connection with the ... closing of the last twelve lots [under the PRP contract].

. . . .

[ ] This affirmative conduct and concealment of the defendants constituted a pattern during October and November 1996 during the sale and continued thereafter through spring of 2000 that CMT was known only to plaintiffs as Saratoga's agent or company owned by or under the control of Saratoga. The active concealment continued until spring of 2000 by the defendants.

[ ] After the conversation with Saratoga's representatives concerning CMT's actual status, further inquiry and investigations were made by plaintiffs concerning the ownership and control of CMT and the circumstances of the two contracts signed in November 1996 by plaintiffs and Saratoga.

¶ 23 We look to pertinent case law for guidance in determining whether these allegations are sufficient to support fraudulent concealment by the Appellees and reasonable action in the face thereof by Russell.

¶ 24 In *Hill v. Allred,* 2001 UT 16, 28 P.3d 1271, the district court granted summary judgment [9] in favor of the defendants on the

---

9. Only in the context of summary judgment have Utah appellate courts addressed the issue of whether a plaintiff successfully made the prima facie showing of fraudulent concealment and then demonstrated that, in light of the defendant's actions, a reasonable plaintiff would not have discovered the cause of action sooner. In such cases, Utah appellate courts examined the pleadings and *factual evidence* relating to when

the plaintiffs would reasonably have been on notice that further inquiry was needed and whether the plaintiff, once on notice, reasonably should have discovered the facts despite the defendants' efforts to hide them. *See, e.g., Hill v. Allred,* 2001 UT 16, ¶ 18–20, 28 P.3d 1271; *Berenda v. Langford,* 914 P.2d 45, 51, 54 (Utah 1996); *Warren v. Provo City Corp.,* 838 P.2d 1125, 1130–31 (Utah 1992); *Chapman v. Primary*

basis of an expired statute of limitations. *See id.* at ¶ 1. On appeal, the supreme court found that the plaintiff "met her burden of making a prima facie showing of fraudulent concealment" where the plaintiff submitted affidavits from five different people to bolster her allegations that the defendants had taken affirmative steps to conceal her cause of action. *Id.* at ¶ 19. She also alleged two meetings in which the defendants lied to her regarding the whereabouts of her stolen money. *See id.* Accordingly, the supreme court reversed summary judgment and remanded for the district court to weigh the reasonableness of the plaintiff's conduct in the face of the defendant's fraudulent concealment to determine whether the concealment prong of the discovery rule applied to toll the statute of limitations on the plaintiff's claims. *See id.* at ¶¶ 17-22.

■■■ ¶ 25 At first glance, the concealment in *Hill* appears more egregious than the concealment pled by Russell in this case. However, on closer examination, Carson and Thomas had fiduciary obligations to Russell with the attendant "duty to speak the truth." *Chapman v. Primary Children's Hosp.*, 784 P.2d 1181, 1186 (Utah 1989). Therefore, material omissions such as Carson's and Thomas's failure to disclose to Russell the true involvement of CMT are similar to the defendant's lies in *Hill.*

¶ 26 Likewise, in *Berenda v. Langford*, 914 P.2d 45 (Utah 1996), the supreme court reversed a grant of summary judgment after the district court refused to apply the concealment prong of the discovery rule. *See id.* at 47, 50. In that case, the defendant asked our supreme court to affirm because, in the defendant's view, two letters written by the plaintiff evincing suspicion of the defendant's wrongful conduct were enough to

start the statute of limitations running such that the plaintiff's claims were time-barred.[10] *See id.* at 50. The supreme court reversed and remanded where the plaintiff "presented a prima facie case" of fraudulent concealment because "weighing the reasonableness of the plaintiff's conduct" in the face of fraudulent concealment to determine whether the statute of limitations was tolled is the province of juries rather than judges. *Id.* at 53–54.

¶ 27 In *Chapman*, our supreme court faced a "close call." 784 P.2d at 1186. There, the plaintiffs moved to dismiss without prejudice their own malpractice suit against a physician after the defendants allegedly misled and misinformed the plaintiffs about the viability of their claim. *See id.* at 1183. After receiving medical records containing the facts underlying their cause of action, the plaintiffs later renewed their malpractice suit, but only after the statute normally would have run. *See id.* at 1183–84. Balancing the misinformation the plaintiffs allegedly received against the actions of the plaintiffs in light of this misinformation, the *Chapman* court determined the plaintiffs were "entitled to their day in court" and reversed a grant of summary judgment. *Id.* at 1186. The court left for the jury the determination of whether, given the defendant's concealment, the plaintiffs "were sufficiently alerted to the possibility of medical malpractice at the time of [their daughter's] cardiac arrest to start the statute of limitations running or whether . . . [the plaintiffs] should reasonably have disregarded [the misinformation] and made an independent inquiry." *Id.* In essence, the court left for the fact-finder the determination of whether or not to apply the discovery rule.

---

*Children's Hosp.*, 784 P.2d 1181, 1184 (Utah 1989). In this case, however, we are reviewing a grant of a motion to dismiss and hence our standard of review is more deferential to the plaintiff. We "must accept the factual allegations in the complaint as true and consider all reasonable inferences . . . from those facts in a light most favorable to the plaintiff." *Prows v. State*, 822 P.2d 764, 766 (Utah 1991). We think the posture of this case weighs heavily in favor of reversal.

10. *Berenda* 914 P.2d 45 (Utah 1996) was decided under a statute of limitations that contained an internal discovery rule like the fraud statute in this case. *See id.* at 51 n. 2. Nevertheless, the court looked to case law decided under statutes of limitations without internal discovery rules because the plaintiff's allegations that the defendants fraudulently concealed the plaintiff's claims required the court in either case to "balance[ ] the reasonableness of the plaintiff in pursuing its claim against the defendant's affirmative actions to conceal." *Id.* at 52.

¶ 28 Russell's pleadings, set out above, clearly allege that the Appellees mislead and misinformed Russell as to CMT's true nature and involvement in the sale of the lots. Under our standard of review in a grant of a rule 12(b)(6) dismissal, and in light of the foregoing authority regarding the fact-finder's role in determining the applicability of the discovery rule, we hold the district court erred in granting the Appellees' motions to dismiss.[11]

## II. Standing as to Fraud Claim

¶ 29 Alternatively, the Appellees argue the district court properly dismissed Russell's fraud claim because Russell lacks standing to bring the claim.[12] Russell alleges in the pleadings that when PRP was dissolved in 1997, PRP assigned to Russell "all of its rights, title and interest in the [PRP] Contract." Russell argues this assignment "includ[ed] any claims relating to the purchase of [the] lots." The Appellees argue, inter alia, that Russell lacks standing because it could not have legally acquired a cause of action for fraud from PRP through assignment. Accordingly, we must determine whether a fraud claim is assignable in Utah.

¶ 30 We conclude that *Mayer v. Rankin*, 91 Utah 193, 63 P.2d 611 (1936), is controlling in this appeal. The facts and procedural posture of *Mayer* are strikingly similar to those we face here. In *Mayer*, the plaintiff brought a claim against the defendant for fraud alleging that the defendant " 'devised a scheme to defraud the plaintiff's assignors ... by selling them stock ... at false and fictitious values.' " *Id.* at 613. Based on the defendant's misrepresentations, the plaintiff's assignors purchased the stock at a price higher than its actual trading value, providing the defendant with significant ill-gotten profits. *See id.* at 613–614. The defendant moved to dismiss the plaintiff's action, asserting the plaintiff lacked standing to bring the fraud claim because a cause of action for fraud was not assignable. *See id.* at 612, 616. The supreme court noted that although tort claims were not assignable at common law, "the rule of nonassignability no longer extends to all actions arising [in tort]" under Utah law. *Id.* (citing *Wines v. Rio Grande W. Ry. Co.*, 9 Utah 228, 33 P. 1042, 1045 (1893) (holding that an action for negligent destruction of property is assignable); *National Union Fire Ins. Co. v. Denver & R.G.R. Co.*, 44 Utah 26, 137 P. 653, 654 (1913) (same); *Lawler v. Jennings*, 18 Utah 35, 55 P. 60, 61 (1898) (holding that an action for money overpaid by mutual mistake is assign-

11. Because Russell's fraud claim is governed by a statute of limitations that includes an internal discovery rule, our analysis differs slightly from the foregoing concealment prong analysis. The pertinent statutory language provides that "[a]n action may be brought within three years ... for relief on the ground of fraud or mistake; except that *the cause of action in such case does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake.*" Utah Code Ann. § 78–12–26(3) (2002) (emphasis added). Interpreting this statute, our supreme court held that "accrual of the cause of action is not complete until discovery of the pertinent facts" constituting the fraud. *Hill*, 2001 UT 16 at ¶ 16, 28 P.3d 1271 (citing Utah Code Ann. § 78–12–26(3)). Hence, despite the Appellees' arguments to the contrary, "the question is not whether the discovery rule applies [to the fraud claim,] but [rather] when [Russell] discovered [its] cause of action [for fraud] and so triggered the running of the statute." *Berenda*, 914 P.2d at 56. As we have discussed above, determining when the statute of limitations began running is a fact question and, accordingly, we hold the district court erred in granting the Appellees' motions to dismiss the fraud claim.

12. The Appellees argue Russell's fraud claim does not pass muster under rule 9(b) of the Utah Rules of Civil Procedure, which requires fraud be pleaded with particularity. *See* Utah R. Civ. P. 9(b). To support this assertion, the Appellees argue, inter alia, that Russell failed to allege that the Appellees made *direct* misrepresentations to Russell with regard to the transactions involving the lots. However, the question is not one of direct misrepresentations, but rather one of false representations. *See Israel Pagan Estate v. Cannon*, 746 P.2d 785, 792 (Utah Ct.App.1987) ("A person cannot be liable for fraud unless he made the false representations himself, authorized someone to make them for him, or participated in the misrepresentation in some way, such as through a conspiracy."); Restatement (Second) of Torts § 533 (1965) ("The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, *although not made directly to the other,* is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction ...." (emphasis added)).

able); *Baglin v. Earl–Eagle Min. Co.*, 54 Utah 572, 184 P. 190, 193 (1919) (holding that a cause of action for conversion is assignable)). The *Mayer* court also pointed out that the Utah Supreme Court had previously held an action to recover stock secured by fraud was an assignable claim. *Id.* at 616 (citing *White v. Texas Co.*, 59 Utah 180, 202 P. 826, 830 (1921)). In light of these prior holdings, the *Mayer* court could find "no good reason why an action for the recovery of money secured by fraud is not likewise assignable." *Id.* The *Mayer* court held that "[w]hile a mere naked right to recover for fraud is not assignable, ... the weight of authority and ... sound legal principles [persuade us that] an assignment is upheld when it carries with it a subsisting substantial right to property independent of the right to sue for fraud." *Id.* at 616–17. The supreme court reversed the district court's dismissal and remanded the case with instructions to reinstate the plaintiff's fraud claim. *See id.* at 618.

¶ 31 We find *Mayer* indistinguishable from the present appeal. Just as in *Mayer*, Russell alleges that the Appellees' fraudulent misrepresentations induced PRP to execute a real estate purchase contract in which PRP agreed to pay a higher price for the property than that for which it was presently selling. Like the defendant in *Mayer*, the Appellees pocketed the ill-gotten profit at the plaintiff's expense. In both cases, the property that the plaintiffs seek to recover through their fraud claims is the money "had [by the plaintiffs] and received [fraudulently by the defendants]." *Id.* at 616. And like the plaintiff in *Mayer*, Russell brought its fraud claim in the capacity of an assignee. Thus, applying *Mayer*, we reverse the dismissal on the fraud claim and allow Russell to pursue its claims against the Appellees.

### III. Fiduciary Duty as to Bustos

¶ 32 Russell contends the district court erred in dismissing Russell's claims against Bustos. Bustos argues that he could not have defrauded Russell because he never made any kind of representation to PRP or Russell. Also, Bustos insists he owed PRP and Russell no duty as a fiduciary, and that he therefore had no duty to reveal his knowledge of the fraudulent scheme.

¶ 33 Generally, "silence ... in the absence of a duty to speak ... does not of itself constitute fraud." 37 C.J.S. *Fraud* § 18 (1997) (footnotes and citations omitted); *cf. Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 333 (Utah 1997) ("The party's silence must amount to fraud."). However, "[a]n exception to the [general] rule ... exists where the circumstances impose on a person a duty to speak and he or she deliberately remains silent." 37 C.J.S. *Fraud* § 19 (footnote and citation omitted); *see Jenson*, 944 P.2d at 333. Furthermore, "[p]arties who knowingly join a fiduciary in fraudulent acts, whereby the fiduciary breaches his or her fiduciary duties, are jointly and severally liable with that fiduciary." 37 Am.Jur.2d *Fraud and Deceit*, § 306 (2001) (citing *Future Group, II v. Nationsbank*, 324 S.C. 89, 478 S.E.2d 45 (1996) (stating "[t]he gravamen of the claim [of aiding and abetting a breach of fiduciary duty] is the defendant's knowing participation in the fiduciary's breach.")); *see also United Park City Mines Co. v. Greater Park City Co.*, 870 P.2d 880, 884–885 (Utah 1993) (reviewing a grant of summary judgment involving a cause of action for aiding and abetting a fraud by breach of fiduciary duty).

¶ 34 Russell alleges in its complaint that: (1) Bustos schemed with Thomas and Carson to purchase the lots and fraudulently resell them to PRP; (2) Bustos made overt acts and representations to induce Saratoga to sell the lots to CMT in the belief that CMT was affiliated with PRP; (3) Bustos, along with Carson and Thomas, made an offer to purchase the lots from Saratoga through CMT for $25,000 per lot; (4) Bustos converted and used Russell's proprietary development plans to further disguise CMT's illegitimacy; (5) Bustos was a member of Poe, the company that sent a $10,000 earnest money wire to the title company to close the CMT contract; (6) Bustos received money in the form of a check at the closing of the CMT contract; (7) Bustos agreed to conceal from PRP the true nature of the "flip purchase and sell" of the lots; (8) Bustos was a real estate agent for Wardley along with Cary and Carson, both of whom represented PRP; and (9) Bustos interjected himself, along with Carson and Thomas, as undisclosed agents and principals for CMT and Poe, while acting as agents and fiduciaries of PRP.

¶ 35 Based on these allegations and reasonable inferences drawn therefrom, we accept that Bustos made overt acts and representations for the purpose of inducing PRP to execute the PRP contract. We also accept that Bustos schemed with the Appellees to commit fraud and later agreed to conceal the fraud in furtherance of the scheme. Likewise, we accept that Bustos aided Carson and Thomas in breaching their fiduciary duties toward PRP.[13] Accordingly, we reverse the dismissal of the fraud claim against Bustos and remand for further proceedings.

## CONCLUSION

¶ 36 For the purposes of surviving a rule 12(b)(6) motion to dismiss, we conclude the concealment prong of the discovery rule applies to toll the statutes of limitations on Russell's claims such that Russell's complaint was timely. Because Utah law allows the assignment of a fraud claim, we conclude Russell has standing to bring its cause of action for fraud. Finally, we hold that Russell's allegations that Bustos committed fraud either by making false representations or by breaching fiduciary duties are sufficient to survive a motion to dismiss. In short, we are not convinced that Russell cannot prove any set of facts to support its claims, and therefore we reverse and remand for further proceedings.

¶ 37 I CONCUR: WILLIAM A. THORNE JR., Judge.

¶ 38 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Judge.

---

13. Russell alleges that Bustos *did* owe fiduciary duties to PRP. In the posture of this case, we agree. Bustos was a real estate agent with Wardley. Both Cary and Carson were Wardley agents at the time the PRP contract was negotiated and executed. Cary listed the lots and Carson represented PRP in its attempts to purchase the lots. Bustos communicated with both Cary and Carson regarding the lots. Bustos received money from transactions involving the lots. Arguably, Bustos was an agent for PRP because Wardley represented PRP. In fact, Russell alleges in its complaint that Bustos "act[ed] as agent[] and fiduciar[y] of [PRP] at the time the PRP contract was negotiated and executed." The determination of "[w]hether or not a confidential or fiduciary relationship exists depends on the facts and circumstances of each individual case." *First Sec. Bank of Utah v. Banberry Dev. Corp.*, 786 P.2d 1326, 1332 (Utah 1990) (quotations and citations omitted).